**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LESLIE'S, INC., *et al.*,[1] | ) | Case No. 26-90795 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS, (B) LIEN CLAIMANTS, (C) FOREIGN VENDORS, AND (D) 503(B)(9) CLAIMANTS; (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS; AND (III) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on October 1, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on October 1, 2026, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/lesliespool/. The location of Debtor Leslie's, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 2005 East Indian School Road, Phoenix, AZ 85016.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively (the "Interim Order" and the "Final Order"), (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) certain vendors and service providers, which are essential to the Debtors' business, including the Debtors' acquisition of pool and spa chemicals, equipment, and on-demand delivery of the Debtors' products (each, a "Critical Vendor"), (ii) shippers, warehousemen, and other lien claimants (each, a "Lien Claimant"), (iii) foreign vendors (each, a "Foreign Vendor"), and (iv) vendors from whom the Debtors may have received goods within the twenty days immediately preceding the Petition Date (each, a "503(b)(9) Claimant," and, together with the Critical Vendors, Lien Claimants, and Foreign Vendors, the "Trade Claimants"); (b) confirming the administrative expense priority status of all undisputed obligations on account of Outstanding Orders (as defined herein); and (c) granting related relief.

2. In addition, the Debtors request that the Court schedule a final hearing within approximately 21 days following the Petition Date to consider entry of the Final Order.

3. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, 2012 U.S. Dist. LEXIS 197295 (S.D. Tex. May 24,

[2] A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jeff White, Chief Financial Officer of Leslie's, Inc. in Support of the Chapter 11 Petitions and the First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

2012). This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief requested herein are sections 105(a), 363, 503(b), 507, 1107(a), and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules") and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

6. The Debtors are the largest direct-to-consumer brand in the United States pool and spa care industry, serving residential, professional, and commercial customers nationwide. Founded in 1963 as a single retail store in North Hollywood, California, the Debtors have grown into an integrated, nationwide organization comprising more than 900 retail locations, a robust digital platform, and an in-field service network of over 200 pool and spa care professionals providing essential, on-site equipment installation and repair services throughout the United States. The Debtors are headquartered in Phoenix, Arizona and employ approximately 3,500 team members. The Debtors commenced these chapter 11 cases to recapitalize their balance sheet, optimize their store footprint, and position themselves for sustainable, long-term growth.

7. On September 30, 2026, after months of negotiations overseen by the board of directors of Leslie's, Inc., the Debtors executed a Restructuring Support Agreement with the Consenting Term Loan Lenders, representing, in the aggregate, approximately 81% of the

Prepetition Term Loan Claims. Pursuant to the Restructuring Support Agreement, the Consenting Term Loan Lenders and the Debtors agreed, subject to the terms and conditions thereof, to support a deleveraging transaction to restructure the Debtors' balance sheet on the terms set forth in the Restructuring Term Sheet (as defined in the Restructuring Support Agreement), to be implemented through a chapter 11 plan.

8. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**Trade Claims Overview**

9. As further described in the First Day Declaration, the Debtors, through their retail locations and e-commerce platform, operate in the aftermarket pool and spa care industry serving residential and professional consumers across the United States. The Debtors' product lines include pool and spa chemicals (such as chlorine, algaecides, shock treatments, and pH balancers), equipment (such as pumps, filters, heaters, and automatic pool cleaners), hot tubs, above ground pools, and related accessories, replacement parts, and safety products, together with the installation, maintenance, and repair services provided through the Debtors' in-field service network.

10. The primary goal of these chapter 11 cases is to implement a comprehensive financial and operational restructuring that will position Leslie's for sustainable, long-term growth. Accomplishing this objective requires maintaining the Debtors' relationships with the Trade

Claimants, who are essential to the Debtors' ability to continue serving their customers and to maximize value for all stakeholders. Specifically, the Debtors rely on the Critical Vendors and Foreign Vendors to supply pool and spa chemicals, equipment, and related products. The Debtors likewise rely on distribution and delivery providers, without which the Debtors would be unable to fulfill orders from their e-commerce platform and keep their retail locations stocked and operating in the ordinary course. The Lien Claimants assist the Debtors with the storage and transportation of the Debtors' inventory as it travels through the Debtors' nationwide supply chain. The Debtors may also have received certain goods from vendors within the twenty (20) days immediately preceding the Petition Date, giving rise to claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.

11. Given the nature of the Debtors' businesses, the Debtors believe that, absent the relief requested herein, many vendors will threaten to cease supplying the Debtors with the specialized goods and services necessary to maintain uninterrupted operations during the pendency of the chapter 11 cases, unless they are paid on account of their prepetition obligations. Any disruption in the Debtors' access to goods and services would have adverse economic and operational impacts on both the affected vendors and the Debtors' other creditors.

12. The Debtors therefore request authorization to pay, either in whole or in part, certain outstanding prepetition claims of the Trade Claimants (the claims of such Trade Claimants, the "Trade Claims"),[3] subject to the limitations set forth in the Interim Order and the Final Order. The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only Trade Claims of Trade Claimants that are critical to maintaining the Debtors' supply

[3] For the avoidance of doubt, the Debtors do not seek authority to pay prepetition claims to any non-Debtor affiliates (the Debtors have none), any insiders (as such term is defined in section 101(13) of the Bankruptcy Code), or any affiliate of any insider.

chain and other services essential to the Debtors' ongoing operations and successful reorganization, and that provide the Debtors with favorable postpetition terms. The following table summarizes the relief sought through this Motion and provides the estimated prepetition amounts attributable to each type of Trade Claim.

| **Category** | **Description of Claims** | **Estimated Amount Due or Due to be Paid Within 21 Days (Interim Order)** | **Estimated Amount Outstanding as of the Petition Date (Final Order)**[4] |
|---|---|---|---|
| Critical Vendors | Domestic suppliers of pool and spa chemicals, equipment, and replacement parts, together with other goods and services that are provided to the Debtors in the ordinary course of business. | $34,700,000 | $46,000,000 |
| Lien Claimants | Shippers, warehousemen, and other suppliers of goods and services that may assert mechanics', possessory, or other liens on the Debtors' inventory or equipment | $1,300,000 | $1,300,000 |
| Foreign Vendors | Suppliers of goods and/or services that are based outside the United States | $70,000 | $300,000 |
| 503(b)(9) Claimants | Trade Claims that may be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code | $0 | $1,100,000 |
| Total | | **$36,070,000** | **$48,700,000** |

13. Some of the Trade Claims may be properly classified as more than one type of claim defined above or may ultimately end up being classified as a different type of claim. The Debtors believe the amounts listed herein are necessary to pay to each category of Trade Claimant to ensure the Debtors' ordinary course operations continue uninterrupted. However, in an exercise of their business judgment, the Debtors may decide that it is prudent to pay more or less to a specific category of Trade Claim. Accordingly, the Debtors request authority to pay the Trade

4 The Debtors have not obtained final invoices for all 503(b)(9) Claims and/or Lien Claims due as of the Petition Date. To the extent that the aggregate total of 503(b)(9) Claims and/or Lien Claims exceeds the amount set forth herein, the Debtors seek authority to pay such amount.

Claims as they come due in the ordinary course of business regardless of how they are ultimately classified.

**I. Critical Vendors**

14. The Debtors' core business focuses on providing customers with a one-stop shop for pool and spa care products and services, including chemicals, equipment, accessories, and professional installation and repair services. Although the Debtors design, manufacture, and market certain products under their own private label for sale in their retail locations and through their e-commerce channels, the Debtors rely on various third-party vendors that supply raw materials and finished goods, packaging, water quality testing instruments, and related services. It is essential to the success of the Debtors' restructuring efforts that they be able to maintain in place the elements of the Debtors' prepetition supply chain and vendor infrastructure that will enable the Debtors to continue operating without disruption.

15. In light of these concerns, the Debtors have identified Critical Vendors that supply products and services that are vital to the Debtors' administration of their chapter 11 cases. More specifically, the Critical Vendors include suppliers of chemicals, specialized pool and spa equipment, and other non-merchandise supplies (collectively, the "Critical Vendor Products and Services"). The Critical Vendor Products and Services are critical to the Debtors' ability to maintain uninterrupted operations for the benefit of all stakeholders.

16. Most of the Critical Vendor Products and Services are available from only a limited number of vendors; others are provided by a sole-source vendor such that no commercially reasonable alternative sources are available. Given that the Debtors rely on chemicals, equipment, and components that are subject to specialized manufacturing processes and regulatory requirements, there may be no true replacement available if a relationship with a Critical Vendor falters. The Debtors' chemical supply chain depends on a concentrated group of upstream

manufacturers of chlorine-based sanitizers, calcium hypochlorite, and other water treatment compounds whose products require specialized production facilities and compliance with hazardous materials regulations. Similarly, the Debtors' equipment offerings depend on manufacturers of variable-speed pumps, filtration systems, heaters, and robotic cleaners, among other products. Even where alternative vendors may exist, the time and costs associated with switching from one vendor to another would likely be significant and detrimental to the Debtors' estates, particularly given the specialized nature of pool and spa chemicals and equipment and the need to maintain consistent product quality and regulatory compliance. Accordingly, any interruption in the provision of the Critical Vendor Products and Services could jeopardize the Debtors' operations and restructuring efforts.

17. Given the Debtors' current financial situation, the risks described herein are not hypothetical—prior to the Petition Date, numerous vendors contacted the Debtors regarding their ongoing relationship with the Debtors. The Debtors believe that many of the Critical Vendors have or will imminently reach their limits and, if the Debtors delay payments for the Critical Vendor Products and Services, the Critical Vendors may cease to supply such products and services altogether. Accordingly, in light of the potential for immediate and irreparable consequences if the Critical Vendors do not continue to provide uninterrupted and timely delivery of the goods and services necessary for the Debtors' operations, the Debtors have determined, in the exercise of their business judgment, that payment of the prepetition claims of the Critical Vendors (the "Critical Vendor Claims") is essential to avoid costly disruptions to their business and reorganization efforts.

## II. Critical Vendor Analysis

18. With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing

personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services. In undertaking this analysis, the Debtors considered a variety of factors, including:

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternate sources;
- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;
- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;
- whether alternate vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;
- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;
- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;
- the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;
- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis; and
- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

19. As of the Petition Date, the Debtors estimate that they owe approximately $46 million on account of unpaid prepetition Critical Vendor Claims, approximately $34.7 million of which will come due within the first 21 days following the Petition Date (the "Interim Period"). Accordingly, the Debtors request authorization, but not direction, to pay all outstanding prepetition obligations on account of Critical Vendor Claims, but only as such amounts come due in the

ordinary course of business or as may be necessary to secure a Critical Vendor's agreement to continue business with the Debtors on Customary Trade Terms (as defined herein).

20. The interruption of business with or absence of the Critical Vendors would reduce the efficiency and value of the Debtors' operations. Any interruption in the provision of the Critical Vendor Products and Services, however brief, would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' estates. Such harm would likely outweigh the cost of payment of the Critical Vendor Claims.[5] Accordingly, to maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' operations and reorganization efforts, the Debtors request authority to pay the Critical Vendors as described herein in their business judgment and where the benefit to the Debtors' estates of doing so will exceed the costs.

## III. Lien Claimants

21. The Debtors routinely transact with third-party contractors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Third-Party Contractors"). These Third-Party Contractors provide key goods and services for the Debtors in the maintenance and operation of their businesses, including (a) installation and repair of pool and spa equipment at customer locations and Debtor-operated service centers, (b) maintenance and improvement of the Debtors' leased and owned retail, warehouse, and distribution facilities, (c) maintenance and improvement of the Debtors' fleet vehicles utilized by its pool and spa care professionals and delivery drivers, (d) manufacturing or assembling

---

[5] Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

component parts necessary for the Debtors' private-label chemical and equipment products, and (e) other repair, renovation, or construction of the Debtors' facilities and properties. Non-payment of Third-Party Contractors could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors. Any of these contingencies would affect the Debtors' anticipated costs and ability to efficiently operate their business.

22. Further, the Debtors transact with various manufacturers and suppliers to produce or otherwise supply pool and spa chemicals, equipment, accessories, and other merchandise and raw materials, and then ship such goods to the manufacturing, warehousing, and distribution facilities operated by the Debtors and certain third-party warehousemen. Certain manufacturers and suppliers ship products and raw materials to the Debtors. The Debtors remit fees to and rely on transportation vendors to maintain their efficient supply chain, including parcel shippers, long- and short-distance freight carriers, and freight pooling carriers. These transportation vendors are integral to the Debtors' distribution network, without which the Debtors' ability to operate their business would likely be impaired. The Debtors' supply chain depends on services provided by, among others, various freight forwarders, common carriers, third-party warehouses, and customs brokers (collectively, the "Shippers and Warehousemen").

23. Under certain non-bankruptcy laws, Lien Claimants (including Shippers and Warehousemen and Third-Party Contractors) may be able to assert liens on the goods in their possession to secure payment of the charges or expenses incurred in connection with these prepetition obligations (collectively, "Lien Claims"). Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such possessory liens and refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed or otherwise impede the Debtors' use of such property until their claims are satisfied and their

liens released. The Lien Claimants' possession (and retention) of the Debtors' goods and supplies would disrupt the Debtors' restructuring efforts and affect the Debtors' ability to efficiently administer these chapter 11 cases. The cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Claims. Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

24. Thus, to maintain access to supplies, products, and services that are essential to the Debtors' operations, the Debtors seek authority to pay outstanding amounts owed to Lien Claimants. As of the Petition Date, the Debtors estimate that they owe approximately $1.3 million on account of unpaid prepetition Lien Claims, all of which will come due in the Interim Period. For the avoidance of doubt, the Debtors seek authority to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the Lien Claimants to continue performing and otherwise supporting the Debtors' administration of their estates on a postpetition basis.

## IV. Customary Trade Terms Condition

25. Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates. To that end, in return for paying the Trade Claims either in full or in part, the Debtors propose that they be authorized to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of their goods and services. Specifically, the Debtors seek authorization to condition payment of Trade Claims upon each Trade Claimant's agreement to (a) continue or recommence providing goods and/or services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during

the twelve months prior to the Petition Date, or as otherwise agreed by the Debtors in their reasonable business judgment (the "Customary Trade Terms") and (b) agree that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases. The Debtors also seek authorization to require certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached to each of the Interim Order and the Final Order as Exhibit A (the "Trade Agreement"). The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms conditions to payment be made in writing, either by use of the Trade Agreement or email.

26. In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by this motion and thereafter ceases to provide goods and services in accordance with the Customary Trade Terms: (a) the Debtors may take any and all appropriate steps to recover from such Trade Claimant any payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such party; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; and (c) if any outstanding postpetition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to such outstanding postpetition balance and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## V. 503(b)(9) Claimants

27. In the ordinary course of business, the Debtors may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the twenty days

immediately preceding the Petition Date, thereby giving rise to claims entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Debtors obtain many of their goods and other materials from such claimants on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders if their 503(b)(9) Claims remain unpaid. Any such refusal or interference could negatively affect the Debtors' estates, as the Debtors' business requires the steady flow of pool and spa chemicals, equipment, and related products through their retail locations, e-commerce platform, and distribution network.

28. Additionally, certain of the 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations. The failure to timely pay 503(b)(9) Claims will unnecessarily disrupt the Debtors' business operations. Given the competitive marketplace in which the Debtors operate, this risk is unnecessary, especially because these claims must ultimately be paid in full under any confirmable plan of reorganization. Paying 503(b)(9) Claims in the ordinary course of business therefore only affects timing, not the amount owed, and serves to protect crucial vendor relationships. As of the Petition Date, the Debtors estimate that they owe approximately $1.1 million on account of unpaid prepetition 503(b)(9) Claims, all of which will come due after the Interim Period. The Debtors request authorization to pay undisputed 503(b)(9) Claims in their sole discretion and business judgment.

## VI. Foreign Vendors

29. A critical component of the Debtors' business activities depends on transactions with certain Foreign Vendors that may possess prepetition claims against the Debtors (the "Foreign Vendor Claims"). The Foreign Vendors supply goods to the Debtors that are crucial to the

Debtors' importation and sale of various products and are, therefore, essential for the continuation of their businesses in the ordinary course during these chapter 11 cases.

30. Due to the critical and multinational nature of the goods the Foreign Vendors provide, maintaining existing relationships with the Foreign Vendors is essential to the Debtors' ability to continue operating in the ordinary course of business. There is a significant risk that the nonpayment of invoices could cause Foreign Vendors to stop providing goods on a timely basis or sever their business relationships with the Debtors completely. The Foreign Vendors lack meaningful contacts with the United States. The Foreign Vendors may therefore consider themselves beyond the jurisdiction of the Court and may disregard or simply be unaware of the automatic stay and its global effect. Failure to make timely payments to the Foreign Vendors in the ordinary course, including on account of prepetition claims, could induce the Foreign Vendors to exercise remedies in their home countries, including commencing lawsuits in non-U.S. courts, asserting or enforcing liens on the Debtors' property, and/or terminating trade contracts. Seeking to enforce an order of the Court in such creditors' home countries would, in many instances, be unduly time-consuming and burdensome for the Debtors, thereby compounding the loss and disruption of operations. It is therefore critical that the Debtors have authority to satisfy Foreign Vendor Claims, as necessary in their business judgment, to maintain ordinary course operations.

31. As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of Foreign Vendor Claims, of which approximately $70,000 will come due in the Interim Period. To maintain access to critical goods the Foreign Vendors provide, the Debtors request authority to pay prepetition Foreign Vendor Claims in the ordinary course of business.

## VII. Outstanding Orders

32. Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding

Orders”). In the mistaken belief that they would be general unsecured creditors of the Debtors’ estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition. As set forth in greater detail below, because the Outstanding Orders are administrative expenses against the Debtors’ estates pursuant to section 503(b) of the Bankruptcy Code, the Debtors request that the Court confirm the administrative expense priority of all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders and authorize the Debtors to pay amounts due on account of Outstanding Orders in the ordinary course of business.

## Basis for Relief

### I. The Court Should Authorize the Debtors to Pay Trade Claims

33. Payment of prepetition obligations is appropriate under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *In re Windstream Holdings Inc.*, 614 B.R. 441, 456–57 (S.D.N.Y. 2020) (finding that a bankruptcy court may authorize a debtor to pay certain claims that are essential to its continued operation); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to pay certain prepetition claims).

34. The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, pursuant to which the Court may “issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of” the Bankruptcy Code. 11 U.S.C. § 105(a). It is well-established that the Court’s authority under section 105(a) extends to “authoriz[ing] the payment of pre-petition claims if such payment [is] essential to the continued operation of the debtor”—known as the “necessity of payment” doctrine or the “doctrine of necessity.” *See In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D.

Del. 1999); *Ionosphere*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex. 2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors to pay certain prepetition claims because "[t]he court d[id] not wish [the] Debtors' businesses seriously damaged"). The rationale for the doctrine of necessity—the rehabilitation of a debtor's business through reorganization—is "the paramount policy and goal of Chapter 11." *Ionosphere*, 98 B.R. at 176; *see In re Scotia Dev., LLC*, No. 07-20027 (RS), 2007 Bankr. LEXIS 3262, at *7–8 (Bankr. S.D. Tex. Sept. 21, 2007); *Just for Feet*, 242 B.R. at 826 (finding that payment of certain prepetition claims was "essential to the survival of the debtor during the chapter 11 reorganization").

35. This approach is particularly critical where prepetition creditors—here, including the Trade Claimants—are vital to the survival of a debtor's business. "[A] *per se* rule proscribing the payment of prepetition indebtedness" would "be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code." *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988). Accordingly, "a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately." *Id.* at 931 (quoting *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987).

36. It is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See,*

*e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (stating that in certain situations, a debtor's fiduciary duty to maximize estate value for all parties can only be satisfied through the payment of a prepetition claim); *CEI Roofing*, 315 B.R. at 58–59 (recognizing the permissibility of paying prepetition obligations, particularly where all sophisticated parties are in agreement).

37. In addition, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.*

38. No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition trade claims. Indeed, the above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the value of the debtor's estate, as is the case here. The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *id.*, and also when the payment was to "sole suppliers of a given product." *Id.* at 498. Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ*'s three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498; *see also Scotia*, 2007 Bankr. LEXIS 3262, at *7–8; *Mirant*, 296 B.R. at 429–30.

39. Allowing the Debtors to pay the Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtors' businesses and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing property available to satisfy creditors"). Reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking. *See CoServ*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

**A. The Court Should Authorize Payment of the Critical Vendor Claims**

40. The Debtors will require a steady provision of the Critical Vendor Products and Services to maintain operational stability as they seek to consummate a value-maximizing restructuring. Without the Critical Vendor Products and Services, the Debtors could be forced to unexpectedly halt certain operations while they search for substitute vendors and service providers and may have to forego existing favorable trade terms as a result in their haste to find new vendors (who may charge a premium given the relatively short nature of any new relationship), thereby preventing the Debtors from capturing value for their creditors. Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the going concern value of the Debtors' assets.

**B. The Court Should Authorize Payment of the Lien Claims**

41. As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim. Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[6] As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, refuse to turn over goods in their possession, or stop performing their ongoing obligations. Even absent a lien, to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment, or products, such possession or retention could disrupt the Debtors' operations.

42. Furthermore, paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases. In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates. In such instances, payment provides such party with what they might be entitled to receive under a plan, without interest that would otherwise accrue during these chapter 11 cases. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into chapter 11 and the ultimate delivery and sale of the Debtors' assets.

[6] *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

**C. The Court Should Authorize Payment of the 503(b)(9) Claims**

43. Section 503(b)(9) of the Bankruptcy Code provides administrative priority to claims for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9).

44. The Debtors must pay 503(b)(9) Claims in full to confirm a plan of reorganization. *See* 11 U.S.C. § 1129(a)(9)(A). Accordingly, the relief requested herein will provide 503(b)(9) Claimants with the treatment to which they would be entitled under a chapter 11 plan (absent their consent otherwise). As a consequence, no party in interest will be materially prejudiced, and it is appropriate for the Court to authorize the Debtors to pay the 503(b)(9) Claims as they come due in the ordinary course of business. *See In re CEI Roofing*, 315 B.R. at 60 ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (i.e., upsetting priorities under the [Bankruptcy] Code and unfair discrimination among general unsecured claims)."); *In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 Bankr. LEXIS 3608, at *10 (Bankr. D. Del. Dec. 21, 2006) ("[T]he timing of the payment of [a claim under section 503(b)(9)] is left to the discretion of the Court.").

45. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—a timing adjustment only—the Debtors would likely lose access to critical products inventory necessary to maintain the Debtors' business operations and maximize the value of their estates. Accordingly, the Debtors seek authorization to pay the 503(b)(9) Claims in the ordinary course of business during these chapter 11 cases.

**D. The Court Should Authorize the Payment of Foreign Vendor Claims**

46. The Foreign Vendors are based outside of the United States and may lack minimum contacts with the United States. There is therefore significant risk that the Foreign Vendors

consider themselves beyond the jurisdiction of the Court and may disregard the automatic stay or be unaware of its global effect. Failure to pay such parties in the ordinary course could lead to a proliferation of lawsuits in foreign courts and force the Debtors to dedicate significant time and resources addressing such issues around the globe. In many instances, it would be unduly time consuming and expensive to seek to enforce an order of this Court in foreign jurisdictions.

47. Nonpayment of any claims owing to Foreign Vendors could lead to immediate and significant disruption to the Debtors' businesses that would heavily outweigh the cost of paying such parties in connection with their prepetition claims, and continuing to pay them on a postpetition basis, in the ordinary course of business. The Debtors believe that paying prepetition claims of Foreign Vendors is necessary to protect the Debtors' businesses and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases. Accordingly, the Debtors seek authorization to pay Foreign Vendor Claims in the ordinary course of business during these chapter 11 cases.

**E. The Court Should Confirm that Outstanding Orders are Administrative Expense Priority Claims and that Payment of Such Claims is Authorized**

48. Pursuant to Section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense claims because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority). Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other

party-in-interest. Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

49. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and the anticipated access to debtor-in-possession financing and the consensual use of cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this Motion.

**Emergency Consideration**

50. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors have satisfied the

"immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

51. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Modification of Bankruptcy Rule 2002(a)(2)**

52. The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors. In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders. Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

53. Nothing contained herein or any actions taken pursuant to the relief requested or granted (including any payment made in accordance with any such order) is intended as or shall be construed as: (a) an admission as to the amount of, basis for, priority of, or validity of, any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any

agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

54. The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) Akin Gump Strauss Hauer & Feld, LLP, as counsel to the Ad Hoc Group; (c) the agents under the Debtors' DIP Facilities and counsel thereto; (d) counsel to the Prepetition ABL Agent; (e) counsel to the Prepetition Term Loan Agent; (f) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no further notice is required.

The Debtors respectfully request entry of the Interim Order and the Final Order, granting the relief requested herein and such other relief as the Court deems appropriate.

Houston, Texas
September 30, 2026

/s/ *Charles A. Beckham, Jr.*

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kelli S. Norfleet (TX Bar No. 24070678)
Re'Necia Sherald (TX Bar No. 24121543)
Imaan Patel (TX Bar No. 24139247)
1221 McKinney St.
Ste. 4000
Houston, TX 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: charles.beckham@haynesboone.com
kelli.norfleet@haynesboone.com
renecia.sherald@haynesboone.com
imaan.patel@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
John R. Luze (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
Stephanie A. Marshak (*pro hac vice* pending)
Zachary J. Weiner (*pro hac vice* pending)
Michael J. Koch (*pro hac vice* pending)
425 Lexington Ave
New York, NY 10017
Telephone: (212) 455-3850
Facsimile: (212) 455-2502
Email: jack.luze@stblaw.com
moshe.fink@stblaw.com
stephanie.marshak@stblaw.com
zachary.weiner@stblaw.com
michael.koch@stblaw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency are true and accurate to the best of my knowledge.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.

**Certificate of Service**

I certify that on September 30, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.