**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LESLIE'S, INC., *et al.*,[1] | ) | Case No. 26-90795 (ARP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER THEIR EXISTING CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on October 1, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on October 1, 2026, at 1:00 p.m. (prevailing Central Time) in Courtroom 400, 4th Floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Pérez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/lesliespool/. The location of Debtor Leslie's, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 2005 East Indian School Road, Phoenix, AZ 85016.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"), (a) authorizing the Debtors to (i) maintain and administer their existing Customer Programs (as defined herein) and honor certain prepetition obligations related thereto on a postpetition basis in the ordinary course and (ii) to modify, renew, replace, supplement, and/or terminate the Customer Programs in the ordinary course of business consistent with past practice and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, 2012 U.S. Dist. LEXIS 197295 (S.D. Tex. May 24, 2012). This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the Court's entry of a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 6003

[2] A description of the Debtors, their business, and the facts and circumstances supporting this Motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Jeff White, Chief Financial Officer of Leslie's, Inc. in Support of the Chapter 11 Petitions and the First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the First Day Declaration.

and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

**Background**

5. The Debtors are the largest direct-to-consumer brand in the United States pool and spa care industry, serving residential, professional, and commercial customers nationwide. Founded in 1963 as a single retail store in North Hollywood, California, the Debtors have grown into an integrated, nationwide organization comprising more than 900 retail locations, a robust digital platform, and an in-field service network of over 200 pool and spa care professionals providing essential, on-site equipment installation and repair services throughout the United States. The Debtors are headquartered in Phoenix, Arizona and employ approximately 3,500 team members. The Debtors commenced these chapter 11 cases to recapitalize their balance sheet, optimize their store footprint, and position themselves for sustainable, long-term growth.

6. On September 30, 2026, after months of negotiations overseen by the board of directors of Leslie's, Inc., the Debtors executed a Restructuring Support Agreement with the Consenting Term Loan Lenders, representing, in the aggregate, approximately 81% of the Prepetition Term Loan Claims. Pursuant to the Restructuring Support Agreement, the Consenting Term Loan Lenders and the Debtors agreed, subject to the terms and conditions thereof, to support a deleveraging transaction to restructure the Debtors' balance sheet on the terms set forth in the Restructuring Term Sheet (as defined in the Restructuring Support Agreement), to be implemented through a chapter 11 plan.

7. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have filed a motion requesting joint

administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

**Customer Programs**

8. Prior to the Petition Date, in the ordinary course of the Debtors' business, the Debtors maintained various customer programs (as described further herein, the "Customer Programs") to, among other things, drive sales and incentivize their customers to make timely payments. The Customer Programs also serve as important marketing and business development tools that the Debtors use to attract new customers and maintain customer relationships. Continuing to honor the Customer Programs, including the prepetition obligations arising thereunder, will maximize the value of the Debtors' estates and benefit all creditors and stakeholders in these chapter 11 cases. Any disruption to the Customer Programs will cause immediate and irreparable harm to the Debtors' reputation, customer loyalty, and ongoing business operations.

9. As of the Petition Date, the Debtors estimate that the aggregate amount of outstanding prepetition obligations (including cash payment obligations and obligations in the form of credits to be applied to future purchases) related to Customer Programs is approximately $19.6 million. The Debtors submit that honoring accrued and unpaid commitments under the Customer Programs and continuing to provide the Customer Programs to eligible customers on a postpetition basis is critical to continuing to secure new business and ensuring the loyalty of their current customers on a go-forward basis. Accordingly, the Debtors seek authorization to maintain the Customer Programs in the ordinary course of business, to modify, renew, replace, supplement,

and/or terminate the Customer Programs in the ordinary course of business consistent with past practice, and to continue to honor all prepetition and postpetition Customer Program-related obligations.

## I. Rebate Programs

10. The Debtors provide several rebates and discounts (the "Rebate Programs") to certain of their customers. Through their commercial and wholesale divisions, the Debtors service a broad base of professional pool operators, commercial property managers, and institutional customers nationwide, including hospitality companies, multi-family housing operators, recreational vehicle parks, group purchasing organizations, and other commercial accounts. Rebates and discounts under the Rebate Programs are generally tied to the volume of customer purchases, the purchase of specific products, year-over-year growth in customer spend, timely payment compliance, and other strategic metrics. Rebate Programs may be offered on a monthly, quarterly, or annual basis, and are frequently tailored to individual customer relationships. Generally, customer rebates and discounts are paid by check or, in certain instances, issued as credits applied to the customer's account or offset against future invoices. These rebates and discounts incentivize the Debtors' wholesale and commercial customers to purchase from and/or promote products that are distributed by the Debtors.

11. The Rebate Programs include, among other things, volume-based purchase allowances calculated as a base percentage of net purchases (typically ranging from 1% to 8% depending on the customer and volume tier), growth allowances tied to year-over-year increases in customer spend (with incremental incentive percentages triggered at specified growth thresholds, typically ranging from 1–2%, in addition to the base rate), flat rate allowances (ranging from 1%–8%), product-specific discounts, and administrative fees. Rebate amounts are typically calculated on a monthly, quarterly, or annual basis and are generally paid by check within 60 days

of the end of each applicable measurement period or, in certain instances, via credit memo or offset against amounts otherwise owed. The Debtors' wholesale distribution subsidiary, Horizon Spa & Pool Parts, Inc. ("Horizon"), also maintains separate rebate agreements with certain large-volume customers, under which Horizon pays tiered rebates on net purchases calculated on a calendar-year basis. The Rebate Programs are essential to maintaining the Debtors' competitive position in the commercial and wholesale pool supply marketplace and preserving long-term customer relationships that generate substantial recurring revenue for the Debtors' estates.

12. As of the Petition Date, the Debtors' accrued but unpaid obligations to customers under the Rebate Programs total approximately $1.1 million (the "Unpaid Rebate Obligations").[3] The Debtors seek authority to pay outstanding prepetition amounts under the Rebate Programs in the ordinary course of business and consistent with past practice and to continue providing the Rebate Programs in the ordinary course of business on a postpetition basis.

## II. Pool Perks Rewards Program

13. The Debtors maintain a customer loyalty rewards program known as the "Pool Perks Rewards Program" (the "Leslie's Loyalty Program") available to residential customers who are 18 years of age or older and residents of the United States. Customers may enroll in the Leslie's Loyalty Program at any Leslie's Pool Supplies retail location, on the Debtors' website, or through the Debtors' mobile app. The Leslie's Loyalty Program is designed to cultivate long-term relationships with the Debtors' residential customers, drive repeat purchases, and increase

[3] Because customers may elect, in their sole discretion, to receive a rebate as either cash or a credit, the Debtors cannot estimate the breakdown of Unpaid Rebate Obligations that fall within each category. For the avoidance of doubt, the Debtors seek authority to (i) pay prepetition amounts in the ordinary course and consistent with past practice and (ii) continue providing the Rebate Programs in the ordinary course of business on a postpetition basis, regardless of the method of receipt selected by a customer.

customer lifetime value. Commercial customers and pool trade professionals are not eligible to participate in the Leslie's Loyalty Program.

14. Through the Leslie's Loyalty Program, all enrolled members earn one point ("Leslie's Loyalty Points") for every dollar spent on eligible purchases at Leslie's Pool Supplies retail locations, on lesliespool.com, or through the Debtors' mobile app (with certain exclusions). Leslie's Loyalty Points are also earned on eligible services the Debtors provide, including, but not limited to, equipment installation, repairs, and cleaning. The Leslie's Loyalty Program features three tiered membership levels: Perks Member, Perks Elite, and Perks MVP. Membership tier is based on the applicable customer's rolling 12-month spend, with increasing rewards and benefits available at higher tiers. Perks Members customers ($0–$349.99 in rolling 12-month spend) earn $1 in Pool Perks rewards for every 100 Leslie's Loyalty Points earned and receive free standard shipping on orders of $100 or more. Perks Elite customers ($350–$799.99 in rolling 12-month spend) earn $1 in Pool Perks rewards for every 50 Leslie's Loyalty Points earned, receive free standard shipping on orders of $100 or more, and receive a 25% off coupon for any pool float upon reaching Perks Elite status. Perks MVP customers ($800 or more in rolling 12-month spend) earn $1 in Rewards for every 25 Leslie's Loyalty Points earned, receive free standard shipping on all orders with no minimum purchase, and receive a 50% off coupon for any pool float upon reaching Perks MVP status.

15. Members remain in their tier for 12 months from the date they qualified, after which requalification is required based on the member's rolling 12-month spend. All tier levels are eligible for local member events and personalized offers throughout the year. Rewards earned through the Leslie's Loyalty Program may be redeemed for discounts on future purchases in-store, online, or through the mobile app, and may be combined with other offers. Rewards earned on

purchases and services generally expire 90 days after issuance. Special rewards, such as achievement rewards or tier-up rewards, have varying expiration dates. Leslie's Loyalty Points are not redeemable for cash, gift certificates, or store credit.

16. Over the past 12 months, approximately 2.8 million Leslie's Loyalty Program members have shopped with Leslie's. Approximately 1.8 million members have redeemed Leslie's Loyalty Points in the preceding 12 months. As of the Petition Date, there are approximately $4.5 million worth of Leslie's Loyalty Points outstanding.

17. In addition to the Pool Perks Rewards Program, the Debtors maintain a separate loyalty program for their Valley Pool and Spa retail locations, the PoolPerks! Loyalty Program (the "Valley Loyalty Program"). Members of the Valley Loyalty Program receive a flat 3% discount on all purchases from the Debtors' Valley Pool & Spa retail locations and access to in-store and online-only discounts.

18. In addition to the Pool Perks Rewards Program and the Valley Loyalty Program, the Debtors maintain a separate loyalty and referral program for pool and spa trade professionals, the Pro Partner Program (the "Pro Partner Program" and, together with the Leslie's Loyalty Program and the Valley Loyalty Program, the "Loyalty Programs"). The Pro Partner Program connects residential customers requiring regular maintenance with local pool and spa trade professionals (the "Pro Partners"). Prospective Pro Partners must apply for the Pro Partner Program and must meet certain conditions to qualify and maintain their status as a Pro Partner, including, but not limited to, insurance coverage and minimum annual spend with the Debtors. Pro Partners in good standing are eligible to receive referrals from the Debtors, as well as certain discounts on pool and spa supplies.

19. The Loyalty Programs are integral to the Debtors' overall customer engagement and retention strategy, driving both in-store traffic and digital commerce activity. The Debtors believe that maintaining the Loyalty Programs is necessary to preserve customer goodwill, generate ongoing sales, and remain competitive against other pool and spa retailers. The Debtors seek authority to continue the Loyalty Programs in the ordinary course of business and to honor all rewards accrued under the Loyalty Programs without regard to whether the obligations arose before, on, or after the Petition Date.

**III. Gift Card and Store Credit Programs**

20. The Debtors maintain gift card and store credit programs (collectively, the "Gift Card Programs") pursuant to which their customers may purchase or receive various forms of prepaid value instruments. The Debtors currently maintain three types of customer gift cards or credits: (a) gift certificates, which customers may purchase in-store and which are redeemable for merchandise at any Leslie's Pool Supplies retail location; (b) merchandise cards, which the Debtors issue electronically through their third-party administrator, Clutch Holdings LLC, as part of the Debtors' AccuBlue Home subscription program described below, through which customer accounts are loaded with $50 per month in store credits during the term of the subscription; and (c) store credits, which the Debtors provide to customers in-store in certain return and exchange situations and which are redeemable in-store (clauses (a) through (c), collectively, the "Gift Cards and Store Credits").

21. Gift Cards and Store Credits purchases are not eligible to earn Leslie's Loyalty Points. The Debtors believe that continuing to honor the Gift Card Programs, including all Gift Cards and Store Credits purchased or issued prepetition, is essential for maintaining customer goodwill throughout these chapter 11 cases. As of the Petition Date, the Debtors estimate that approximately $5.1 million in Gift Cards and Store Credits remain outstanding. By this Motion,

the Debtors seek authority to honor all Gift Cards and Store Credits purchased by or issued to customers prior to the Petition Date and maintain the Gift Card Programs in the ordinary course of business, consistent with past practice.

**IV. Return and Exchange Program**

22. The Debtors maintain a customary return and exchange program (the "Return and Exchange Program") pursuant to which their customers may return purchased merchandise for a refund or exchange. If a customer is not satisfied with a purchase, the customer may return the item within 30 days for a replacement or refund. Products must be unused, in new condition, and in original packaging, and the customer must present a receipt or proof of purchase. Products purchased in-store or online may be returned or exchanged at any of the Debtors' retail locations.

23. Refunds are generally credited to the original form of payment. For credit card purchases, refunds are applied to the original card used. For cash or check purchases under $200, refunds are provided in cash or as store credit. For cash or check purchases of $200 or more, refunds may be issued as store credit or a check within 10 business days of the applicable return. Refunds for purchases using Gift Cards and Store Credits are issued only as store credit. Certain items are excluded from the Return and Exchange Program, including, without limitation, custom orders, opened pool liners or pool covers, and certain hazardous chemical products. Damaged or defective products may generally be exchanged in-store or by contacting customer service within 30 days of purchase.

24. Programs like the Return and Exchange Program are common in the retail industry in which the Debtors operate, and the Debtors' competitors use similar programs. Maintaining the Return and Exchange Program is critical to maintaining the goodwill of the Debtors' customer base. Without the Return and Exchange Program, potential customers may be unwilling to purchase merchandise from the Debtors, the ultimate cost of which would be borne by the Debtors'

estates. Accordingly, the Debtors seek authorization to continue honoring customer obligations in connection with the Return and Exchange Program in a manner consistent with their prepetition practices.

**V. AccuBlue Water Testing and Membership Programs**

25. The Debtors offer commercial-grade in-store water testing and analysis via their proprietary AccuBlue system (the "AccuBlue In-Store Program"). Any customer may bring a water sample to any Leslie's Pool Supplies retail location for a free 10-point water test that takes approximately 60 seconds. Following the test, the Debtors' in-store experts leverage the AccuBlue diagnostics software to generate a customized water treatment prescription plan, providing customers with a step-by-step product use sequence tailored to their pool or spa's specific conditions.

26. In addition, the Debtors offer AccuBlue Home, a subscription-based membership offering (the "AccuBlue Home Program" and, together with the AccuBlue In-Store Program, the "AccuBlue Programs") that enables pool and spa owners to test and treat their pools and spas at home using a proprietary app-enabled connected device. The AccuBlue Home Program is available for a $50 per month subscription. Members receive a free AccuBlue Home testing device and $50 in monthly store credits (the "AccuBlue Membership Credits") that can be used to purchase chemicals or supplies. AccuBlue Membership Credits are valid for 12 months after issuance. Members may pause or cancel their membership at any time.

27. The AccuBlue Programs are a key differentiator for the Debtors in the competitive pool and spa care marketplace and are integral to the Debtors' customer engagement, conversion, and loyalty strategy. The AccuBlue In-Store Program drives in-store traffic and creates a long-term relationship between the Debtors and their customers. The AccuBlue Home Program generates recurring subscription revenue while driving product purchases through the monthly

membership credits. The Debtors seek authorization, but not direction, to continue the AccuBlue Programs in the ordinary course of business on a postpetition basis consistent with prepetition practice.

## VI. Financing Programs

28. The Debtors provide their customers with access to third-party financing options to facilitate the purchase of pool and spa equipment, spas, above ground pools, and other pool and spa related products or services (the "Financing Programs"). Through the Debtors' online platform, customers may elect to finance qualifying purchases through Affirm, Inc. ("Affirm"), a third-party buy-now-pay-later provider. When a customer selects Affirm at checkout for orders over $100, Affirm evaluates the customer's eligibility and, if approved, provides the customer with a payment plan. The Debtors receive payment from Affirm at the time of purchase and do not bear the credit risk associated with such customer payment plans.

29. In addition, certain of the Debtors offer customer financing through certain of their cash management banks[4] and through financing programs in partnership with certain hot tub manufacturers. The Debtors' AquaQuip, Oregon Hot Tub, and International Hot Tub locations also facilitate customer financing through a local mutual savings bank, 1st Security Bank. The Debtors believe that maintaining the Financing Programs is important for facilitating customer purchases of higher-ticket items. The Debtors seek authority to continue the Financing Programs in the ordinary course of business. As of the Petition Date, the Debtors do not believe that they have any amounts due and owing attributable to the Financing Programs, but out of an abundance

[4] For a more detailed description of customer financing, refer to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue Cash Management Programs, and (C) Continue to Perform Intercompany Transactions; and (II) Granting Related Relief*, filed contemporaneously herewith.

of caution seek the authority to honor such Financing Programs obligations that may have arisen prior to the Petition Date.

## VII. Service and Warranty Programs

30. The Debtors operate an extensive in-field service network of over 200 pool and spa care professionals providing on-site equipment installation and repair services for residential consumers and professional pool operators throughout the United States (the "Service Programs"). The Debtors' service technicians perform on-site evaluations, equipment installation, and repair services. The Debtors provide a 90-day post-purchase guarantee on all service work. In addition, the Debtors offer warranties on refurbished hot tubs ranging from 90 days to 6 months for higher-end units. The warranties the Debtors offer are primarily pass-through original equipment manufacturer warranties for third-party products, including for electronics sold by the Debtors. The Debtors also offer free in-store repair labor at their retail locations.

31. The Service Programs are an essential component of the Debtors' value proposition and differentiate the Debtors from competitors who do not offer integrated service capabilities. The Debtors seek authority to continue the Service Programs in the ordinary course of business and to honor all prepetition obligations related thereto.

## VIII. Customer Deposits and Prepayments

32. In the ordinary course of business, the Debtors collect deposits and prepayments from customers in connection with certain transactions (collectively, "Customer Deposits"). Customer Deposits are typically required in the following circumstances: (a) for special-order merchandise (including items not typically carried in-store, custom safety covers, custom spa covers, and custom pool liners), the Debtors typically require a full deposit at the time the order is placed; (b) for on-site service installations, the Debtors may require deposits ranging from a product-only deposit, with the balance of labor charges paid at the time of installation, to full

prepayment; (c) for commercial customer special orders exceeding a customer's approved accounts receivable limit, the Debtors require a 50% down payment; and (d) at the Debtors' hot tub and spa specialty retail locations, deposits vary by company, category, and promotion, and typically range from $500 to 50% of the purchase price.

33. As of the Petition Date, the Debtors estimate that they hold approximately $8.8 million on account of Customer Deposits. Customer Deposits are integral to the Debtors' business and critical to maintaining the goodwill of the Debtors' customer base, as they enable customers to secure desired products and services. The Debtors seek authority to continue collecting Customer Deposits in the ordinary course and to honor all prepetition obligations related to Customer Deposits, including the delivery of merchandise and performance of services for which deposits have been collected prepetition, consistent with prepetition practices.

## IX. Promotional Programs

34. In the ordinary course of business, the Debtors conduct various sales promotions and offer certain promotional discounts and incentives (collectively, the "Promotional Programs"). The Promotional Programs include, among other things, seasonal markdowns, limited-time discount codes, email signup discount offers, member-exclusive promotional pricing, price match guarantees, and various other customer incentives communicated through the Debtors' email marketing, mobile app, on-site advertising, and digital platforms.

35. The Debtors believe that the Promotional Programs encourage retail sales and improve customer relationships, inuring to the benefit of the Debtors' estates. The Promotional Programs are not generally redeemable for cash and thus do not typically require an independent cash outlay by the Debtors. Nevertheless, the Debtors seek authority to honor the Promotional Programs in the ordinary course and consistent with past practice.

## Basis for Relief

**I. Continuing to Honor the Customer Programs in the Ordinary Course Is Warranted Under Sections 105(a) and 363 of the Bankruptcy Code and Is in the Best Interests of the Debtors' Estates**

36. The Debtors believe that the continuation of, and payments required to maintain, the Customer Programs fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code. To the extent any such actions do not constitute ordinary course transactions, however, the Debtors request that the Court authorize the Debtors to continue to honor and make payments on account of the Customer Programs.

37. Payment of prepetition obligations is appropriate under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g.*, *In re Windstream Holdings Inc.*, 614 B.R. 441, 456–57 (S.D.N.Y. 2020) (finding that a bankruptcy court may authorize a debtor to pay certain claims that are essential to its continued operation); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that a sound business justification existed to pay certain prepetition claims).

38. The Court may also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, pursuant to which the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). It is well-established that the Court's authority under section 105(a) extends to "authoriz[ing] the payment of pre-petition claims if such payment [is] essential to the continued operation of the debtor"— known as the "necessity of payment" doctrine or the "doctrine of necessity." *See In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999); *Ionosphere*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *In re CEI Roofing, Inc.*, 315 B.R. 50, 56, 60–61 (Bankr. N.D. Tex.

2004) (holding that payment of certain prepetition claims under the doctrine of necessity is "based on both common sense and the express provisions of the Bankruptcy Code"); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2004) (authorizing the debtors to pay certain prepetition claims because "[t]he court d[id] not wish [the] Debtors' businesses seriously damaged"). The rationale for the doctrine of necessity—the rehabilitation of a debtor's business through reorganization—is "the paramount policy and goal of Chapter 11." *Ionosphere*, 98 B.R. at 176; *see In re Scotia Dev., LLC*, No. 07-20027 (RS), 2007 Bankr. LEXIS 3262, at *7–8 (Bankr. S.D. Tex. Sept. 21, 2007); *Just for Feet*, 242 B.R. at 826 (finding that payment of certain prepetition claims was "essential to the survival of the debtor during the chapter 11 reorganization").

39. This approach is particularly critical where prepetition creditors—here, the Debtors' customers—are vital to the survival of a debtor's business. "[A] *per se* rule proscribing the payment of pre-petition indebtedness" would "be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code." *In re Structurlite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988). Accordingly, "a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary to 'permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately.'" *Id.* at 931 (quoting *In re Chateaugay Corp.*, 80 B.R. 279, 287 (S.D.N.Y. 1987)).

40. It is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (stating that in certain situations, a debtor's fiduciary duty to maximize estate value for all parties can only be satisfied through the payment of a prepetition claim); *CEI Roofing*, 315 B.R. at 58–59 (recognizing the

permissibility of paying prepetition obligations, particularly where all sophisticated parties are in agreement).

41. In addition, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.*

42. Each of these standards is satisfied here. There can be no doubt that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates. Customers expect and rely on the Customer Programs and may not continue to support the Debtors' business if the Customer Programs are discontinued. Support from the Debtors' customers is essential for go-forward operations.

43. The substantial benefit conferred on the Debtors' estates by the Customer Programs warrants the authority to honor the Customer Programs and any of the Debtors' obligations related thereto, including payment of outstanding prepetition amounts. Thus, the Debtors respectfully request the authority to continue their Customer Programs and honor prepetition commitments related thereto in the ordinary course of business on a postpetition basis.

**<u>Processing of Checks and Electronic Fund Transfers Should Be Authorized</u>**

44. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and the anticipated access to debtor-in-possession financing and the consensual use of cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can

readily identify checks or wire transfer requests relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this Motion.

**Emergency Consideration**

45. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors request emergency consideration of this Motion. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm. Failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

46. The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Modification of Bankruptcy Rule 2002(a)(2)**

47. The Debtors request that the Court, for cause, modify the service requirements set forth in Bankruptcy Rule 2002(a)(2) to limit service of this Motion only to the core service list and affected creditors. In light of the breadth and complexity of the Debtors' business, serving the Motion on all creditors, even those that are unaffected by the relief sought herein, would cause unnecessary confusion and expense to the detriment of all stakeholders. Accordingly, sufficient cause exists under Bankruptcy Rule 2002(a)(2) to modify the service requirements for this Motion.

**Reservation of Rights**

48. Nothing contained herein or any actions taken pursuant to the relief requested or granted (including any payment made in accordance with any such order) is intended as or shall be construed as: (a) an admission as to the amount of, basis for, priority of, or validity of, any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all

parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

49. The Debtors will provide notice of this Motion to: (a) the U.S. Trustee; (b) Akin Gump Strauss Hauer & Feld, LLP, as counsel to the Ad Hoc Group; (c) the agents under the Debtors' DIP Facilities and counsel thereto; (d) counsel to the Prepetition ABL Agent; (e) counsel to the Prepetition Term Loan Agent; (f) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no further notice is required.

[*Remainder of page intentionally left blank*]

The Debtors respectfully request entry of the Order, granting the relief requested herein and such other relief as the Court deems appropriate.

Houston, Texas
September 30, 2026

/s/ *Charles A. Beckham, Jr.*

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kelli S. Norfleet (TX Bar No. 24070678)
Re'Necia Sherald (TX Bar No. 24121543)
Imaan Patel (TX Bar No. 24139247)
1221 McKinney St.
Ste. 4000
Houston, TX 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: charles.beckham@haynesboone.com
kelli.norfleet@haynesboone.com
renecia.sherald@haynesboone.com
imaan.patel@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
John R. Luze (*pro hac vice* pending)
Moshe A. Fink (*pro hac vice* pending)
Stephanie A. Marshak (*pro hac vice* pending)
Zachary J. Weiner (*pro hac vice* pending)
Michael J. Koch (*pro hac vice* pending)
425 Lexington Ave
New York, NY 10017
Telephone: (212) 455-3850
Facsimile: (212) 455-2502
Email: jack.luze@stblaw.com
moshe.fink@stblaw.com
stephanie.marshak@stblaw.com
zachary.weiner@stblaw.com
michael.koch@stblaw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Accuracy**

In accordance with Local Rule 9013-1(i), I hereby certify that the foregoing statements regarding the nature of the emergency are true and accurate to the best of my knowledge.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.

**Certificate of Service**

I certify that on September 30, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Charles A. Beckham, Jr.*
Charles A. Beckham, Jr.

# Exhibit A

## Order