**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LESLIE'S, INC., *et al.*,[1] | ) | Case No. 26-90795 (ARP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF LESLIE'S, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**HAYNES AND BOONE, LLP**
Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kelli S. Norfleet (TX Bar No. 24070678)
Kourtney Lyda (TX Bar No. 24013330)
Re'Necia Sherald (TX Bar No. 24121543)
Imaan Patel (TX Bar No. 24139247)
1221 McKinney St.
Ste. 4000
Houston, TX 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: charles.beckham@haynesboone.com
kelli.norfleet@haynesboone.com
kourtney.lyda@haynesboone.com
renecia.sherald@haynesboone.com
imaan.patel@haynesboone.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
John R. Luze (admitted *pro hac vice*)
Michael J. Koch (admitted *pro hac vice*)
167 North Green Street, Suite 1400
Chicago, IL 60607
Telephone: (312) 449-5130
Email: jack.luze@stblaw.com
michael.koch@stblaw.com

- and -

Moshe A. Fink (admitted *pro hac vice*)
Stephanie A. Marshak (admitted *pro hac vice*)
Zachary J. Weiner (admitted *pro hac vice*)
425 Lexington Ave
New York, NY 10017
Telephone: (212) 455-3261
Facsimile: (212) 455-2502
Email: moshe.fink@stblaw.com
stephanie.marshak@stblaw.com
zachary.weiner@stblaw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/lesliespool/. The location of Debtor Leslie's, Inc.'s corporate headquarters and the Debtors' service address in these chapter 11 cases is 2005 East Indian School Road, Phoenix, AZ 85016.

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF, UPON APPROVAL OF THIS DISCLOSURE STATEMENT, SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF LESLIE'S, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NO ENTITY MAY RELY UPON OR USE ANYTHING IN THIS DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE X HEREIN.**

**THE DEBTORS AND CERTAIN HOLDERS OF CLAIMS AND INTERESTS SUPPORT THE PLAN, INCLUDING THE CONSENTING TERM LOAN LENDERS (AS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT (AS DEFINED HEREIN)). THE DEBTORS BELIEVE THAT THE COMPROMISES THE PLAN CONTEMPLATES ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST POSSIBLE RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION HEREIN OR THE BANKRUPTCY COURT'S ENDORSEMENT OF THE PLAN'S MERITS.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT HAS PROVIDED THE FACTUAL INFORMATION IN THIS DISCLOSURE STATEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE DEBTORS' FINANCIAL CONDITION AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN REGARDLESS OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED AMENDED OR MODIFIED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE PLAN'S CONFIRMATION AND EFFECTIVENESS ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN. THERE IS NO ASSURANCE THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**THE DEBTORS ENCOURAGE YOU TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING <u>ARTICLE X</u> OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE DEBTORS PREPARED THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) BUT DID NOT NECESSARILY PREPARE IT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THIS DISCLOSURE STATEMENT OR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- **BUSINESS STRATEGY;**
- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING FORECASTS;**
- **AVAILABILITY AND TERMS OF CAPITAL;**
- **COUNTERPARTIES' CREDIT RISK;**
- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**
- **COSTS OF CONDUCTING THE DEBTORS' OTHER OPERATIONS;**
- **GENERAL ECONOMIC AND BUSINESS CONDITIONS (INCLUDING WITH RESPECT TO NON-U.S. CURRENCY FLUCTUATIONS, TARIFFS, AND/OR TRADE NEGOTIATIONS);**
- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**
- **OUTCOME OF PENDING AND FUTURE LITIGATION OR ANY REGULATORY PROCEEDINGS;**
- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**
- **PLANS, OBJECTIVES, INTENTIONS, AND EXPECTATIONS;**
- **ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;**
- **GOVERNMENTAL REGULATIONS AND TAXATION APPLICABLE TO THE DEBTORS, INCLUDING ANY CHANGES THERETO;**

- **POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS;**
- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;**
- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS; AND**
- **THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE BLUE SKY LAWS FOR THE ISSUANCE AND RESALE OF SECURITIES UNDER THE PLAN.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' OR REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER AND VENDOR RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; THE IMPACT OF THE COVID-19 PANDEMIC AND GOVERNMENT RESPONSES THERETO; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

**The Debtors have filed neither this Disclosure Statement nor the Plan with the SEC or any state authority. Neither the SEC nor any state securities commission has approved or disapproved of the Plan, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.**

**The Debtors prepared this Disclosure Statement pursuant to sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3016(b), and it is not necessarily prepared in accordance with federal or state securities laws or other similar laws. The Securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under applicable state securities law (collectively, the "Blue Sky Laws"). The Debtors intend to rely on, to the extent each is available, (a) section 1145 of the Bankruptcy Code and/or (b) Section 4(a)(2) of the Securities Act and applicable exemptions under the Blue Sky Laws to exempt the offer, issuance, and distribution of Securities of the Reorganized Debtors in connection with the Plan from registration under the Securities Act and the Blue Sky Laws. This Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities.**

**Upon confirmation of the Plan, (a) the New Common Equity (other than the Equity Financing Securities (which, as defined in the Plan, means the New Common Equity (i) offered in the Equity Financing and (ii) issued on account of the Equity Financing Backstop Premium)) on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims, as described in this Disclosure Statement, will be offered, issued, and distributed without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145(a) of the Bankruptcy Code, and, to the extent such exemption is not available, then such New Common Equity will be offered, issued, and distributed under the Plan pursuant to Section 4(a)(2) of the Securities Act or such other applicable exemptions from registration under the Securities Act and any other applicable securities laws, and (b) the Equity Financing Securities will be offered, issued, and distributed in reliance on Section 4(a)(2) of the Securities Act and similar Blue-Sky Laws. Any such Securities offered, issued, and distributed pursuant to Section 4(a)(2) of the Securities Act will be considered "restricted securities" under the Securities Act, will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act. Neither the solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

**The availability of the exemption under section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, or any other applicable exemption from securities laws will not be a condition to the occurrence of the Effective Date; *provided* that the Confirmation Order shall provide that the New Common Equity is exempt from registration as set forth in Article V.L of the Plan.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement, other than a recitation of historical fact, and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "continue," or the negatives of such terminology, as well as any similar or comparable language. All forward-looking statements are as of the date made, are based on the Debtors' beliefs, intentions, and expectations as of such date, and are not guarantees of future performance. The Debtors caution readers that any forward-looking statements in this Disclosure Statement are based on assumptions that the Debtors believe to be reasonable, but are subject to a wide range of risks, including risks associated with the following: (a) future financial results and liquidity, including the ability to finance operations in the ordinary course of business; (b) the relationships with and payment terms provided by trade creditors; (c) additional post-restructuring financing requirements; (d) future dispositions and acquisitions; (e) the effect of competitive products, services, or procuring by competitors; (f) changes to the costs of commodities and raw materials; (g) the proposed restructuring and costs associated therewith; (h) the effect of conditions in the local, national, and global economy on the Debtors; (i) the ability to obtain relief from the bankruptcy court to facilitate the smooth operation of the Debtors' businesses under chapter 11; (j) the Plan's confirmation and consummation; (k) the terms and conditions of the New Term Loans and the New Common Equity to be entered into, or issued, as the**

**case may be, pursuant to the Plan; and (l) each of the other risks identified in this Disclosure Statement. Due to these uncertainties, the Debtors cannot assure readers that any forward-looking statements will prove to be correct. The Debtors are under no (and expressly disclaim any) obligation to update or alter any forward-looking statements whether as a result of new information, future events, or otherwise, unless instructed to do so by the Bankruptcy Court.**

**The Debtors caution readers that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.**

**Each recipient of this Disclosure Statement, by its acceptance hereof, acknowledges that (i) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a Debtor, which is obtained from the Debtors or their representatives, from purchasing or selling securities of such Debtors, or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated under the Securities Exchange Act, and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential or material information in contravention of the Securities Exchange Act or any of its rules and regulations, including Section 10(b) and Rule 10b-5.**

## TABLE OF CONTENTS


Page

**I. INTRODUCTION ... 1**

**II. PRELIMINARY STATEMENT ... 1**

**III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE CHAPTER 11 PROCESS ... 2**

A. What is chapter 11? ... 2
B. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ... 3
C. Why are the Debtors sending me this Disclosure Statement? ... 3
D. What is the Restructuring Support Agreement? ... 3
E. What are the Restructuring Transactions Under the Plan? ... 4
F. Am I Entitled to Vote on the Plan? ... 4
G. What is the deadline to vote on the Plan? ... 5
H. How do I vote for or against the Plan? ... 5
I. In Which Class Are Administrative Claims, Priority Tax Claims, DIP ABL Claims, DIP Term Loan Claims, and Professional Fee Claims? ... 5

**IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ... 5**

A. Restructuring Support Agreement and Plan ... 5
B. Classification of Claims and Interests Under the Plan ... 5
C. Treatment of Classes of Claims and Interests Under the Plan ... 6
D. Administrative Claims, Professional Fee Claims, and Priority Claims ... 8
E. DIP ABL Claims ... 10
F. DIP Term Loan Claims ... 11
G. Special Provision Governing Unimpaired Claims ... 11
H. Elimination of Vacant Classes ... 11
I. Intercompany Interests ... 11
J. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 11
K. Controversy Concerning Impairment ... 12
L. Subordinated Claims ... 12
M. Means for Implementation of the Plan ... 12
N. Recommendation by the Debtors ... 22

**V. OTHER KEY ASPECTS OF THE PLAN ... 22**

A. Treatment of Executory Contracts and Unexpired Leases ... 22

**VI. QUESTIONS AND ANSWERS REGARDING THE DEBTORS' RESTRUCTURING PLAN ... 25**

A. Who Supports the Plan? ... 25
B. What Will I Receive if the Plan Is Consummated? ... 25
C. What happens to my recovery if the Plan is not Confirmed or does not go effective? ... 25
D. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation" and "Effective Date?" ... 25
E. Is there potential litigation related to the Plan? ... 25
F. Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? ... 26
G. How will the preservation of the Causes of Action impact my recovery under the Plan? ... 26
H. Will there be releases and exculpation granted to parties in interest as part of the Plan? ... 26
I. What is the effect of the Plan on the Debtors' ongoing businesses? ... 31

J. Where can I find out more about the Restructuring Transactions that will be effectuated through the Plan? ....31

**VII. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW....32**

A. The Debtors' Corporate History....32
B. The Debtors' Operations....32
C. The Debtors' Prepetition Capital Structure....33

**VIII. EVENTS LEADING TO THE CHAPTER 11 FILINGS....35**

A. Financial and Operational Headwinds....35
B. Efforts to Reorganize and Negotiations with Creditors....36

**IX. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES....37**

A. First Day Relief....37
B. Bar Date Motion....39
C. Lease Optimization and Omnibus Contract and Lease Motion....39
D. Schedules and Statements....40
E. Milestones....40

**X. RISK FACTORS....41**

A. Bankruptcy Law Considerations....41
B. Risks Related to Recoveries under the Plan....46
C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses....47
D. Risks Related to the Offer and Issuance of Securities Under the Plan....52

**XI. SOLICITATION, VOTING, AND NEW EQUITY ELECTION PROCEDURES....56**

A. Holders of Claims Entitled to Vote on the Plan....56
B. Voting Record Date....56
C. Voting on the Plan....56
D. Ballots Not Counted....57

**XII. CONFIRMATION OF THE PLAN....57**

A. Requirements for Confirmation of the Plan....57
B. Best Interests of Creditors/Liquidation Analysis....58
C. Feasibility....58
D. Acceptance by Impaired Classes....58
E. Confirmation Without Acceptance by All Impaired Classes....59
F. Valuation of the Reorganized Debtors....60

**XIII. CERTAIN SECURITIES LAW MATTERS....60**

A. Issuance of New Common Equity in Reliance on Section 1145....61
B. Subsequent Transfers of New Common Equity (other than Equity Financing Securities)....61
C. Issuance of Equity Financing Securities in Reliance on Section 4(a)(2)....63
D. Subsequent Transfers of Equity Financing Securities....63

**XIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN....65**

A. Introduction....65
B. Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors....67

C. Certain U.S. Federal Income Tax Consequences to U.S. Holders ....69
D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders ....75
E. Information Reporting and Back-up Withholding ....80

**XV. RECOMMENDATION ....82**

**EXHIBITS**[2]

EXHIBIT A Plan of Reorganization

EXHIBIT B Restructuring Support Agreement

EXHIBIT C Liquidation Analysis

EXHIBIT D Financial Projections

EXHIBIT E Valuation Analysis

2 Each Exhibit is incorporated herein by reference.

## I. INTRODUCTION

Leslie's, Inc. ("Leslie's") and its affiliates, as debtors and debtors in possession (collectively, the "Debtors" or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Reorganization of Leslie's, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan").[3] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II. PRELIMINARY STATEMENT

The Debtors are the largest direct-to-consumer brand in the pool and spa care industry in the United States, serving residential, professional, and commercial customers nationwide. Headquartered in Phoenix, Arizona, the Debtors have grown into an omni-channel, nationwide platform comprising approximately 900 retail locations across 38 states, a robust digital commerce platform (lesliespool.com) providing direct-to-consumer e-commerce sales, and a professional services division comprising over 200 in-field pool and spa care professionals who provide on-site equipment installation, maintenance, and repair services throughout the United States. The Debtors also operate two manufacturing facilities that produce proprietary chemical products and four distribution centers that support the Company's nationwide operations. The Debtors' vertically integrated supply chain provides the Company with competitive advantages in product availability and cost management.

Despite the Debtors' market-leading position, they have faced significant financial headwinds over the past several years. Beginning in 2023, the U.S. pool and spa care industry experienced a pronounced contraction driven by several macroeconomic and industry-specific factors, including: (i) a normalization of demand following the elevated spending levels observed during the COVID-19 pandemic, when consumers made significant investments in home improvement and outdoor living; (ii) persistent inflationary pressures on input costs, including chemicals, energy, and transportation; (iii) a contraction in consumer discretionary spending as interest rates rose and household budgets tightened; (iv) unfavorable weather patterns in key markets that shortened pool seasons and suppressed demand for maintenance chemicals; and (v) increased competition from big box and online marketplace retailers. As a result, the Debtors experienced deterioration in profitability, including significant net losses in fiscal years 2024 and 2025. The revenue decline, coupled with a highly leveraged capital structure, placed substantial strain on the Debtors' liquidity position and their ability to service their funded debt obligations.

In response to the challenging financial performance and liquidity constraints, from October 2024 onwards, the Debtors began undertaking a series of cost-reduction and operational efficiency initiatives, including: (a) rationalization of the store footprint through closure of underperforming locations; (b) headcount reductions and organizational restructuring at the corporate level; (c) renegotiation of vendor

---

[3] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

contracts and optimization of inventory management to reduce working capital requirements; (d) deferral and reduction of capital expenditures; and (e) implementation of pricing and promotional strategies designed to stabilize comparable-store sales trends.

The Debtors experienced significant management turnover during this period. Between 2024 and 2025, Leslie's board of directors (the "Board") appointed new executive leadership resulting in a near-complete refresh of the Debtors' officers. Once installed, and after careful analysis and operational assessments, the new management team determined that it was prudent to begin exploring capital structure alternatives to address the Debtors' financial headwinds and other challenges. To that end, the Debtors engaged Centerview Partners ("Centerview") as their investment banker and Berkeley Research Group, LLC ("BRG") as a financial advisor to explore strategic alternatives. On or around August 2025, the Debtors and their advisors engaged with an ad hoc group of holders of the Debtors' Prepetition Term Loan Claims (the "Ad Hoc Group") to discuss possible alternatives. Initially, the discussions focused on an out-of-court maturity extension transaction as well as raising new money to capitalize the business and fund growth operations. Between Q4 2025 and Q1 2026, the Company, in conjunction with its advisors, including Centerview, BRG, and Simpson Thacher & Bartlett LLP, conducted a third-party financing process in parallel to the discussions with the Ad Hoc Group to raise new capital to support the business and position the business for future refinancing. As time progressed and the Company's financial performance continued to face significant headwinds, it became clear that the out-of-court transaction was no longer viable and that the optimal path forward was a holistic restructuring transaction, implemented through an in-court process.

Over the fourteen months preceding the Petition Date, the Debtors, the Ad Hoc Group, and their respective advisors worked diligently to negotiate, document, and finalize the terms of value-maximizing restructuring transactions (the "Restructuring Transactions"). On September 30, 2026, the Debtors and members of the Ad Hoc Group entered into the Restructuring Support Agreement. The Restructuring Support Agreement and the exhibits thereto lay out the terms of restructuring transactions that have the support of holders of in excess of 80% of the outstanding Prepetition Term Loan Claims (the "Consenting Term Loan Lenders"). The Restructuring Support Agreement is designed to avoid a prolonged in-court process and position the Debtors to emerge as a going concern with stronger financial and operational profiles. To that end, the Restructuring Support Agreement includes certain milestones (the "Milestones"), including emergence from chapter 11 within 110 days after the Petition Date. The Debtors believe that they can confirm the Plan and emerge from chapter 11 within this timeframe, preserving the value inherent in the Restructuring Support Agreement without prejudicing parties-in-interest and their ability to assert their rights in these chapter 11 cases.

The Restructuring Support Agreement is a significant achievement for the Debtors. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates and represents the best available alternative at this time. Given the core strengths of the Debtors' business, the Debtors are confident that they can implement the Restructuring Support Agreement's deleveraging and rationalizing transactions and emerge from chapter 11 with long-term viability. For these reasons, the Debtors strongly recommend that holders of claims so entitled vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE CHAPTER 11 PROCESS

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors

and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the debtor's legal and equitable interests as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as the bankruptcy court may order. Subject to certain limited exceptions, the order the bankruptcy court issues confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims, Noticing, and Solicitation Agent, Kroll Restructuring Administration, LLC ("Kroll"), via one of the following methods:

*By regular mail, overnight mail, or e-mail at:*
Leslie's, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232
lesliespoolinfo@ra.kroll.com

*By telephone at:*
844.408.3397 (Toll-Free)
+1 646.825.3745 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the chapter 11 cases are available upon written request to Kroll at the address above or by downloading the exhibits and documents from Kroll's website at https://restructuring.ra.kroll.com/lesliespool/ (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov (for a fee).

### C. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### D. What is the Restructuring Support Agreement?

Before commencing the chapter 11 cases, and following months of arm's length negotiations among the Debtors and the Ad Hoc Group regarding the potential terms of a value-maximizing transaction, the Debtors and the Consenting Term Loan Lenders entered into the Restructuring Support Agreement, a

copy of which is attached hereto as **Exhibit B** and was also attached to the First Day Declaration as Exhibit A. The Restructuring Support Agreement provides for the terms of the Plan, whereby the Company will emerge from chapter 11 as a leaner enterprise positioned for long-term continuity as a going concern. The Restructuring Support Agreement also provides for terms regarding DIP financing, access to cash collateral, and fully committed exit financing, including a fully-backstopped equity investment.

The Restructuring Support Agreement includes Milestones for an approximately 110-day chapter 11 process, allowing the Debtors to move efficiently through these chapter 11 cases and effectuate the Restructuring Transactions. The other Milestones include:

- no later than three (3) days after the Petition Date, the Debtors shall have delivered the Subscription Procedures and Subscription Form to all Prepetition Term Loan Lenders;
- no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;
- no later than five (5) Business Days after the Agreement Effective Date, the Transformation Committee shall have been established and shall have held its initial organizational meeting;
- no later than seven (7) days after the Petition Date, the Debtors shall have filed the Omnibus Contract and Lease Motion;
- no later than twenty (20) days after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement;
- no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;
- no later than fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Disclosure Statement;
- no later than one hundred (100) days after the Petition Date, the Bankruptcy Court shall have entered the order confirming the Plan; and
- no later than one hundred and ten (110) days after the Petition Date, the Effective Date shall have occurred.

### E. What are the Restructuring Transactions Under the Plan?

The Plan contemplates a standalone recapitalization of the Debtors' balance sheet and implementation of the Debtors' retail location rationalization initiative, pursuant to which the Debtors will reject leases for certain of their underperforming and non-performing retail locations and consummate moveouts from certain retail locations at which the Debtors ceased operations before the Petition Date.

### F. Am I Entitled to Vote on the Plan?

Your eligibility to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of November 13, 2026). Each category of Claims or Interests, as set forth in Article IV of the Plan, pursuant

to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth in Article IV herein.

### G. What is the deadline to vote on the Plan?

The deadline to vote on the Plan (the "Voting Deadline") is December 16, 2026, at 4:00 p.m. (prevailing Central Time).

### H. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, for Classes 3B and 4, the applicable ballot must be properly completed, executed, and delivered as directed, so that the ballot containing your vote is **actually received** by the Debtors' solicitation agent, Kroll (in such capacity, the "Solicitation Agent") **on or before the Voting Deadline, *i.e.* December 16, 2026, at 4:00 p.m., prevailing Central Time**. *See* Article XI of this Disclosure Statement, entitled, "Solicitation, Voting, and New Equity Election Procedures," which begins on page 56 for more information.

### I. In Which Class Are Administrative Claims, Priority Tax Claims, DIP ABL Claims, DIP Term Loan Claims, and Professional Fee Claims?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP ABL Claims, and DIP Term Loan Claims have not been classified and are thus excluded from the Classes of Claims and Interests set forth in Article IV of the Plan. Treatment for Administrative Claims, DIP ABL Claims, DIP Term Loan Claims, Priority Tax Claims, and Professional Fee Claims is set forth in Article III of the Plan. Such Claims are Unimpaired under the Plan and, pursuant to section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan.

## IV. THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A. Restructuring Support Agreement and Plan

On September 30, 2026, the Debtors and the Consenting Term Loan Lenders, including holders of in excess of 80% of outstanding Prepetition Term Loan Claims, entered into the Restructuring Support Agreement. Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the restructuring contemplated thereby, including the Plan, a copy of which is attached hereto as **Exhibit A**. The Restructuring Transactions the Plan contemplates will significantly reduce the Debtors' funded debt obligations and result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' restructuring process. The Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Plan will significantly deleverage the Debtors' balance sheet while preserving the Debtors' ability to operate their business competitively in their industry.

The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will control.

### B. Classification of Claims and Interests Under the Plan

Your ability to vote on, and your distribution under, the Plan (if any) depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as

defined herein). Each category of holders of Claims or Interests, as set forth in Article IV of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3A | Prepetition ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3B | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### C. Treatment of Classes of Claims and Interests Under the Plan

The following chart provides a summary of the anticipated recovery to each Class of Claims or Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Type of Claim** | **Treatment** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| 1 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Term Loan Lenders (such consent not to be unreasonably withheld), either: (i) payment in full in Cash in the ordinary course of business; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | 100% |
| 2 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | N/A | 100% |
| 3A | Prepetition ABL Claims | On the Effective Date, to the extent not rolled up into the DIP ABL Facility, each Holder of an Allowed Prepetition ABL Claim shall have its Allowed Prepetition ABL Claim either (i) with the consent of the Prepetition ABL Agent and the Prepetition ABL Lenders on a dollar-for-dollar basis automatically converted to and deemed to be obligations under the New ABL Facility or (ii) repaid in full and in Cash from the proceeds of the New ABL Facility, as applicable. | $[●] | 100% |
| 3B | Prepetition Term Loan Claims | On the Effective Date, each holder of an Allowed Prepetition Term Loan Claim shall receive its Pro Rata share of 10% of the New Common Equity (subject to dilution on account of the MIP). | $[●] | [●]% |
| 4 | General Unsecured Claims | On the Effective Date, each holder of an Allowed General Unsecured Claim entitled to receive a distribution shall receive its Pro Rata share of the GUC Cash Pool. | $[●] | [●]% |
| 5 | Intercompany Claims | Each holder of an Allowed Intercompany Claim shall have its Claim Reinstated or cancelled, released, and extinguished without any distribution as reasonably determined by the Debtors or Reorganized Debtors with the consent of the Required Consenting Term Loan Lenders (not to be unreasonably withheld, delayed or conditioned). | N/A | N/A |
| 6 | Intercompany Interests | Intercompany Interests shall be Reinstated, set off, settled, distributed, contributed, cancelled, and released without any distribution on account of such Intercompany Interests, or such other treatment as reasonably determined by the Debtors with the consent of the Required Consenting Term Loan Lenders (not to be unreasonably delayed, withheld or conditioned). | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Type of Claim** | **Treatment** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| 7 | Existing Equity Interests | On the Effective Date, all Existing Equity Interests shall be cancelled, released and extinguished and will be of no further force and effect, and holders of Existing Equity Interests will not receive any distribution on account thereof. | N/A | N/A |
| 8 | Section 510(b) Claims | All Section 510(b) Claims shall be discharged and released, and each holder of a Section 510(b) Claim shall not receive or retain any distribution, property, or other value on account of its Section 510(b) Claim. | N/A | N/A |

## D. Administrative Claims, Professional Fee Claims, and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP ABL Claims, and DIP Term Loan Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article IV of the Plan.

### 1. Administrative Claims

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors (with the consent of the Required Consenting Term Loan Lenders, which consent shall not be unreasonably withheld), or the Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article III.A of the Plan, and except with respect to Administrative Claims that are Professional Fee Claims or Restructuring Expenses, requests for payment of Administrative Claims must be Filed with the Bankruptcy Court and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed with the Bankruptcy Court and served on the Debtors and the requesting party no later than 60 days after the Effective Date. Notwithstanding the foregoing, no request for payment

of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

**2. Professional Fee Claims**

**a. Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount Allowed by the Bankruptcy Court, including from the Professional Fee Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date in accordance with the Plan.

**b. Professional Fee Escrow Account**

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors and the Debtors and the Reorganized Debtors shall have no claim whatsoever to or interest in such funds, except to the extent specified in the last sentence of this paragraph. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed; *provided* that such obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. Only upon such refunding of the excess amounts in the Professional Fee Escrow Account to the Debtors, shall such funds become property of the Reorganized Debtors.

**c. Professional Fee Amount**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three days before the Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

**d. Post-Confirmation Fees and Expenses**

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses of the Professionals related to implementation of the Plan and Consummation incurred by the Debtors; *provided*, *however*, that the Debtors shall not pay any monthly, transaction, restructuring, financing, completion, success, or other similar fee unless the Court has approved the retention of such Professional and such fees are approved by the Bankruptcy Court or

pursuant to the Plan. For any fees and expenses (other than monthly, transaction, restructuring, financing, completion, success, or other similar fee) incurred from and after the Confirmation Date, the Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, reasonable fees and expenses incurred by the Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable; provided that such Professionals shall also (i) serve Consenting Term Loan Lenders' Advisors, the Debtors or Reorganized Debtors, the Creditors' Committee, and the U.S. Trustee (collectively, the "Statement Parties") the monthly statements of such Professionals' claims for compensation or reimbursement of expenses with reasonable detail and (ii) file a notice with the Bankruptcy Court reflecting the amount of the fees and expenses requested by such Professional. If the Debtors, Reorganized Debtors, or the Statement Parties, as applicable, dispute the reasonableness of any such invoice, the Debtors, Reorganized Debtors, or the Statement Parties, as applicable, or the affected Professional may file an objection with the Bankruptcy Court, and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 4. Payment of Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement and any other fee arrangements, without any requirement to File a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. In addition, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course, Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

## E. DIP ABL Claims

All DIP ABL Claims shall be deemed Allowed as of the Effective Date. On the Effective Date, the DIP ABL Facility shall be refinanced by the New ABL Facility, and, in full and final satisfaction of the outstanding DIP ABL Claims, such Claims shall be either (i) with the consent of the DIP ABL Agent and the DIP ABL Lenders refinanced by means of a cashless settlement or (ii) repaid in full and in Cash, including the cancellation, replacement, or cash collateralization of all issued and undrawn letters of credit in accordance with the terms and in the amounts specified under the DIP ABL Documents, from the

proceeds of the New ABL Facility, as applicable. To the extent the DIP ABL Facility is refinanced by means of a cashless settlement, (i) all principal amount of DIP ABL Loans shall be on a dollar-for-dollar basis automatically converted to and deemed to be obligations under the New ABL Facility, (ii) the letters of credit issued and outstanding under the DIP ABL Credit Agreement shall be converted to letters of credit deemed to be issued and outstanding under the New ABL Documents, (iii) all Collateral that secures the Obligations (each as defined in the DIP ABL Credit Agreement) under the DIP ABL Credit Agreement shall be reaffirmed, ratified and shall automatically secure all Obligations (as defined in the New ABL Documents) under the New ABL Documents, subject to the priorities of Liens set forth in the New ABL Documents, and (iv) each Holder of a DIP ABL Claim shall receive its Pro Rata share of Cash on account of any interest, fees, or expenses outstanding with respect to such Holder's DIP ABL Loans as of the Effective Date.

**F. DIP Term Loan Claims**

All DIP Term Loan Claims shall be deemed Allowed as of the Effective Date. On the Effective Date, in full and final satisfaction of the outstanding DIP Term Loan Claims, (i) $75 million of the DIP Term Loan Claims shall be automatically converted on a dollar-for-dollar basis to and deemed to be New Term Loan Obligations, and (ii) the remaining DIP Term Loan Claims, including on account of the DIP Premium Loans and any accrued or capitalized interest, shall be converted on a ratable basis into 30% in the aggregate of the New Common Equity (subject to dilution on account of the MIP).

**G. Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**H. Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**I. Intercompany Interests**

To the extent Reinstated under the Plan, for the avoidance of doubt, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the holders of New Common Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims.

**J. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article IV.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b)

of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**K. Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date or such other date as fixed by the Bankruptcy Court.

**L. Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, and subject to the Restructuring Support Agreement, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**M. Means for Implementation of the Plan**

**1. General Settlement of Claims and Interests**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VII of the Plan, all distributions made to holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be and shall be final.

**2. Restructuring Transactions**

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into and shall take all actions as may be necessary, appropriate, or desirable to effectuate the Restructuring Transactions, including as set forth in the Restructuring Steps Memorandum, that are consistent with and pursuant to the terms and conditions of the Plan and the Restructuring Support Agreement. The actions to implement the Restructuring Transactions may include but shall not be limited to: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and

having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the issuance of the New Common Equity (including in connection with the Equity Financing); (5) the execution and delivery of the New Term Loan Documents and any filing related thereto; (6) the execution and delivery of the New ABL Documents and any filing related thereto; (7) the execution and delivery of the New Organizational Documents of each Reorganized Debtor; (8) funding of the GUC Cash Pool; and (9) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall and shall be deemed pursuant to sections 363 and 1123 of the Bankruptcy Code to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

The terms of the Restructuring Transactions will be structured to maximize tax efficiencies for each of the Debtors and the Consenting Term Loan Lenders, as agreed to by the Debtors and the Required Consenting Term Loan Lenders and in accordance with the Plan and the Plan Supplement.

### 3. The Reorganized Debtors

On the Effective Date, the New Board shall be established and, if applicable, the Reorganized Debtors shall adopt the New Organizational Documents. Such New Organizational Documents shall become effective and binding in accordance with their terms and conditions, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or Entity. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors, Reorganized Debtors, or Disbursing Agent.

### 4. Sources of Consideration for Restructuring Transactions

The Debtors and the Reorganized Debtors, as applicable, shall fund or otherwise effect the distributions and the Restructuring Transactions contemplated under the Plan with: (1) the New Term Loans, which shall be used to refinance, in part, the term loans under the DIP Term Loan Credit Agreement; (2) the New ABL Facility, which shall be used to refinance the revolving loans under the DIP ABL Credit Agreement; (3) the issuance of the New Common Equity, including through the Equity Financing; and (4) Cash on hand as of the Effective Date.

#### a. New Term Loans

On the Effective Date, the Reorganized Debtors shall incur the New Term Loans pursuant to the terms set forth in the New Term Loan Documents. Confirmation of the Plan shall be deemed approval of the New Term Loan Facility and the New Term Loan Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the New Term Loan Documents and such other documents as may be required, advisable, or convenient to effectuate the treatment afforded by the New Term Loan Facility. Execution of the New Term Loan Credit Agreement by the Agent under the New Term Loan Credit Agreement shall be deemed to bind all holders of DIP Term Loan Claims and all New Term Loan Lenders as if each such holder or New Term Loan Lender had executed the New Term Loan Credit Agreement with appropriate

authorization. Each Reorganized Debtor and each other guarantor or grantor under the New Term Loan Documents is authorized to enter into and perform thereunder without further corporate or other action. The obligations under the New Term Loan Documents, including the guarantees thereof, shall constitute legal, valid, binding, and enforceable obligations of each party thereto and shall not be subject to avoidance, recharacterization, subordination, setoff, or other challenge under the Bankruptcy Code or applicable non-bankruptcy law.

On the Effective Date, all of the Liens and security interests to be granted or confirmed (as applicable) pursuant to, or in connection with, the New Term Loan Documents (including any Liens and security interests granted or confirmed (as applicable) on the Reorganized Debtors' assets) (a) shall be deemed to be granted or confirmed (as applicable), (b) shall be valid, legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Term Loan Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New Term Loan Documents, and (d) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary, advisable, or convenient to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically on the Effective Date by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date and any such filings, recordings, approvals, and consents shall not be required for perfection), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**b. New ABL Facility**

On the Effective Date, the Reorganized Debtors shall incur the New ABL Facility pursuant to the terms set forth in the New ABL Documents. Confirmation of the Plan shall be deemed approval of the New ABL Facility and the New ABL Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the New ABL Documents and such other documents as may be required, advisable, or convenient to effectuate the treatment afforded by the New ABL Facility. Execution of the New ABL Credit Agreement by the New ABL Agent under the New ABL Credit Agreement shall be deemed to bind all New ABL Lenders as if each such New ABL Lender had executed the New ABL Credit Agreement with appropriate authorization. Each Reorganized Debtor and each other guarantor or grantor under the New ABL Documents is authorized to enter into and perform thereunder without further corporate or other action. The obligations under the New ABL Documents, including the guarantees thereof, shall constitute legal, valid, binding, and enforceable obligations of each party thereto and shall not be subject to avoidance, recharacterization, subordination, setoff, or other challenge under the Bankruptcy Code or applicable non-bankruptcy law.

On the Effective Date, all of the Liens and security interests to be granted or confirmed (as applicable) pursuant to, or in connection with, the New ABL Documents (including any Liens and security interests granted or confirmed (as applicable) on the Reorganized Debtors' assets) (a) shall be deemed to be granted or confirmed (as applicable), (b) shall be valid, legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New ABL

Documents, (c) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the New ABL Documents, and (d) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary, advisable, or convenient to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically on the Effective Date by virtue of the entry of the Confirmation Order and the occurrence of the Effective Date and any such filings, recordings, approvals, and consents shall not be required for perfection), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

**c. New Common Equity**

On the Effective Date, the Issuer shall issue the New Common Equity pursuant to the Equity Financing and the Plan. The issuance of the New Common Equity, including the New Common Equity on account of the DIP Term Loan Claims (including on account of the DIP Premium Loans and any accrued or capitalized interest) and Equity Financing Backstop Premium, by the Issuer shall be authorized without (1) the need for any further corporate, limited liability company, partnership, or other governance action and without any action by the holders of Claims, members, managers, directors, or officers of the Debtors or Reorganized Debtors, as applicable, or other parties in interest, (2) notice to or order or other approval of the Bankruptcy Court, (3) act or omission under applicable law, regulation, order, or rule, or (4) vote, consent, authorization, or approval of any Person.

All of the Units of New Common Equity, including such Units issued in connection with the DIP Term Loan Claims (including the DIP Premium Loans and any accrued or capitalized interest) and Equity Financing Backstop Premium, issued pursuant to the Equity Financing and the Plan shall be duly authorized, validly issued, fully paid, and non-assessable and deemed not to have been issued in violation of any preemptive rights, rights of first refusal or similar rights or any applicable law. Each distribution and issuance of New Common Equity shall be governed by the terms and conditions set forth in the Equity Financing Documents, the New Organizational Documents, and the Plan as applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance without the need for execution by any party thereto other than the applicable Reorganized Debtor(s). Any Entity's acceptance of New Common Equity shall be deemed to constitute its agreement to enter into, and the New Common Equity shall be subject to, the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms. The New Common Equity will not be registered under the Securities Act nor listed on any exchange as of the Effective Date and will not meet the eligibility requirements of the Depository Trust Company.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Equity (other than the Equity Financing Securities) on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims, in accordance with the terms of the Plan, shall be exempt from the registration and prospectus delivery requirements of the Securities Act and any other applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. In addition (and to the extent that section 1145 shall be deemed not to apply to any New Common Equity), pursuant to Section 4(a)(2) of the Securities Act, the offering, issuance,

and distribution of New Common Equity (including the Equity Financing Securities) is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. Such New Common Equity (including the Equity Financing Securities) issued under Section 4(a)(2) of the Securities Act will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and other applicable law. The New Common Equity underlying the MIP will be issued pursuant to an available exemption from the registration requirements under the Securities Act and other applicable law. Subject to any transfer restrictions set forth in the New Organizational Documents, holders of restricted securities will, however, be permitted to resell New Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such securities are registered with the SEC.

Confirmation of the Plan shall be deemed approval of (1) the Equity Financing and the Equity Financing Documents and (2) all transactions contemplated thereby, and all actions to be taken and undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Equity Financing Documents, and such other documents as may be required to effectuate the Equity Financing.

#### d. Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand as of the Effective Date to fund distributions, consistent with the terms of the Plan.

#### e. Equity Financing

On the Effective Date, the Debtors shall consummate the Equity Financing, through which each Equity Financing Participant shall be obligated to purchase New Common Equity at the Price Per Unit, subject to the terms and conditions set forth in the Plan and the Restructuring Support Agreement. The Price Per Unit shall be payable in Cash. On or prior to the Effective Date, the Equity Financing Participants will be required to fund into escrow with a bank, trust company, or other agent approved by the Debtors and the Required Consenting Term Loan Lenders an amount equal to the Price Per Unit for such Equity Financing Participant's allocable share of the Equity Financing Amount for the express benefit of the Reorganized Debtors. Upon Consummation, such Cash shall be released to the Reorganized Debtors for their use in accordance with the Plan and the New Organizational Documents.

The percentage ownership attributable to the New Common Equity offered in the Equity Financing will be equal to 55.8% of the New Common Equity (subject to dilution on account of the MIP).

The Equity Financing shall be backstopped by the Equity Financing Backstop Parties in accordance with the terms and subject to the conditions of the Restructuring Support Agreement. Subject to, and in accordance with the Restructuring Support Agreement, as consideration for the commitments of the Equity Financing Backstop Parties under the Restructuring Support Agreement, the Equity Financing Backstop Parties shall receive the Equity Financing Backstop Premium, which shall be fully earned and nonrefundable upon entry by the Bankruptcy Court of the Disclosure Statement Order, and payable on the Effective Date. The commitments of the Equity Financing Backstop Parties under the Restructuring Support Agreement are several, not joint, obligations of the Equity Financing Backstop Parties, such that no Equity Financing Backstop Party shall be liable or otherwise responsible for the commitments of any other Equity Financing Backstop Party under the Restructuring Support Agreement. Following the

Subscription Deadline (as defined in the Restructuring Support Agreement), no Equity Financing Backstop Party shall be permitted to transfer (including, for the avoidance of doubt, any sale, exchange, assignment, pledge or encumbrance) any Stapled Obligations and Interests without the prior written consent of the Debtors, which consent shall not be unreasonably withheld, conditioned or delayed, subject to the terms of the Restructuring Support Agreement; provided, the Debtors' prior written consent shall not be required for such transfers to any other Equity Financing Backstop Party, Affiliate or Affiliate fund. For the avoidance of doubt, any transfer must also include a ratable transfer of such transferring party's Stapled Obligations and Interests.

The proceeds of the Equity Financing shall be used by the Reorganized Debtors for working capital and general corporate purposes.

**5. Corporate Existence**

Except as otherwise provided in the Plan or Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or in the Plan Supplement, each Debtor, as Reorganized Debtors, shall continue to exist after the Effective Date, each as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended, amended and restated, or replaced under the Plan or otherwise, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other organizational documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with the terms thereof without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**6. Corporate Action**

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors in accordance with the Restructuring Support Agreement; (3) implementation of the Restructuring Transactions; (4) incurrence of the New Term Loans and entry into the New Term Loan Documents; (5) incurrence of the New ABL Facility and entry into the New ABL Documents; (6) issuance of the New Common Equity, including pursuant to the Equity Financing; (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (8) adoption of the New Organizational Documents; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). On the Effective Date the New Term Loans, the New ABL Facility, and the New Common Equity shall be automatically deemed outstanding without any signatures or other acts required by any holders of Prepetition ABL Claims or Prepetition Term Loan Claims, as applicable. On or prior to the Effective Date, all actions required by this Plan that would otherwise require approval of the holders of Interests, members, directors, or officers of the Debtors (as of prior to the

Effective Date) or Reorganized Debtors shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the holders of Interests, members, directors, or officers of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of the appropriate holders of Interests, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. For the avoidance of doubt, the appropriate holders of Interests, members, directors, or officers of the Debtors or the Reorganized Debtors shall be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) including the New Term Loan Documents, the New ABL Documents, the New Common Equity, the New Organizational Documents, in the name and on behalf of the Reorganized Debtors and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.F shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

**7. Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Confirmation Order, the Plan (including, for the avoidance of doubt, the Restructuring Steps Memorandum), or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, other encumbrances, and interests. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects. For the avoidance of doubt, the Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges, interests, and other encumbrances are being extinguished.

**8. Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the Effective Date, except for the purposes of evidencing a right to a distribution under the Plan and except to the extent otherwise provided herein or the Confirmation Order, as applicable, all loans, notes, instruments, certificates, credit agreements, indentures, Securities and other documents evidencing Claims or Interests, including the Prepetition Term Loan Credit Agreement and the Prepetition ABL Credit Agreement, the Existing Equity Interests, and each related document thereto, shall be cancelled or otherwise terminated, and the rights of holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect; provided that any indemnity, reimbursement, or similar provision in favor of the Agents in any credit agreement, note purchase agreement, security document, ancillary document, or intercreditor agreement related to the Prepetition Term Loans or the Prepetition ABL Facility that by its terms survives the termination of such agreement or document shall remain in full force and effect notwithstanding the consummation of the Restructuring Transactions.

**9. New Organizational Documents**

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted or amended in a manner consistent with the terms and conditions set forth in the Restructuring Support Agreement by the applicable Reorganized Debtors, as may be necessary to effectuate

the Restructuring Transactions contemplated by the Plan. Such New Organizational Documents shall become effective and binding in accordance with their terms and conditions, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or Entity. On or prior to the Effective Date or as soon thereafter as is practicable, and to the extent required under the Plan or applicable non-bankruptcy law, each Reorganized Debtor will file its New Organizational Documents with the applicable Secretary of State or other applicable authority in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents. For the avoidance of doubt, each holder of New Common Equity shall be deemed to have executed, be a party to and be bound by the terms of the New Organizational Documents from and after the Effective Date, even if not an actual signatory thereto and without the need to deliver signature pages thereto.

#### 10. Directors and Officers of the Reorganized Debtors

On the Effective Date, the terms of the current members of the board of directors or managers (as applicable) of Leslie's, Inc. shall be automatically terminated without any further action of the Reorganized Debtors, and the members for the initial term of the New Board shall be appointed in accordance with the applicable New Organizational Documents. The current members of the board of directors or managers (as applicable) of Leslie's, Inc., in their capacities as such, shall have no continuing obligations to Leslie's, Inc. or the Reorganized Debtors on or after the Effective Date, and each such director or manager (as applicable) shall be deemed to have resigned or shall otherwise cease to be a director or manager (as applicable) of Leslie's, Inc. on the Effective Date. The members of the New Board shall be identified in the Plan Supplement. The management structure of the Reorganized Debtors, and all officers and management decisions with respect to the Reorganized Debtors (and/or any of their direct or indirect subsidiaries), compensation arrangements, and Affiliate transactions shall be subject to the required approvals and consents set forth in the New Organizational Documents.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, and the New Organizational Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.

#### 11. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers, as applicable, are authorized to and may issue, execute, deliver, file, or record to the extent not inconsistent with any provision of the Plan, such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Steps Memorandum, the New Term Loan Documents, the New ABL Documents, the New Organizational Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, actions, notices, or consents except for those expressly required pursuant to the Plan.

### 12. Certain Securities Law Matters

All equity interests of the Reorganized Debtors issued and distributed pursuant to the Plan, including the New Common Equity, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon: (i) an exemption from such registration requirements under section 1145 of the Bankruptcy Code; (ii) an exemption from such registration requirements under Section 4(a)(2) of the Securities Act; and (iii) such other exemption as may be available from any applicable registration requirements.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, exchange, and distribution of the New Common Equity (other than the Equity Financing Securities) to holders of DIP Term Loan Claims and Allowed Prepetition Term Loan Claims on account of such Claims, as contemplated by Article III.F and Article IV.B of the Plan, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, exchange, distribution, or sale of Securities, to the maximum extent possible. Under section 1145 of the Bankruptcy Code, such New Common Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments, and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

The Equity Financing Securities (and to the extent that section 1145 shall be deemed not to apply to any New Common Equity, such New Common Equity) will be issued in reliance upon the exemption from registration under the Securities Act set forth in Section 4(a)(2).

To the extent New Common Equity is issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act, it will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Subject to any transfer restrictions set forth in the New Organizational Documents, holders of restricted securities will, however, be permitted to resell New Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such securities are registered with the SEC.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date; *provided* that the Confirmation Order shall provide that the New Common Equity is exempt from registration as set forth in Article V.L of the Plan.

### 13. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, Security, or other Interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for any or all of the New Term Loans or the New ABL Facility; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds,

bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego imposition or the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 14. Employee Matters

The Reorganized Debtors may, in the ordinary course of business and consistent with past practice, continue their wages, compensation, and benefits programs. On the Effective Date, the Debtors shall (a) assume all existing employment agreements, indemnification agreements, or other employment-related agreements entered into with current and former employees or (b) with the consent of the Required Consenting Term Loan Lenders (not to be unreasonably withheld or delayed), enter into new agreements with such employees on terms and conditions acceptable to the Debtors and such employee.

For the avoidance of doubt, the Debtors shall not assume (i) equity or equity-based incentive plans, employee stock purchase plans and any other agreements or awards or provisions set forth in any agreements, awards, plans or programs that provide for rights to acquire Interests or New Common Equity and (ii) any agreement or plan whose value or performance is related to Interests or New Common Equity or other ownership interests of any Debtor, in each case, which shall be deemed to be terminated on the Effective Date; provided, for the avoidance of doubt, that the Restructuring Transactions shall not trigger or be deemed to trigger (i) any change of control, change in control, immediate vesting, termination or similar provision therein or (ii) an event of "good reason" (or a term of like import) as a result of the consummation of the Restructuring Transactions.

### 15. MIP

After the Effective Date, the New Board shall adopt the MIP, with the form of the awards under the MIP (e.g., options, restricted stock or units, appreciation rights, etc.), the participants in the MIP, the allocations of the awards to such participants (including the amount of allocations and the timing of the grant of the awards), the terms and conditions of the awards (including vesting, exercise prices, base values, hurdles, forfeiture, repurchase rights and transferability) to be determined by the New Board in consultation with the Reorganized Debtors' senior management team.

### 16. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan, or pursuant to Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### N. Recommendation by the Debtors

The Debtors believe that the Plan provides for a higher distribution to the Debtors' stakeholders, taken as a whole, than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan. Accordingly, the Debtors recommend that you vote in favor of the Plan.

## V. OTHER KEY ASPECTS OF THE PLAN

### A. Treatment of Executory Contracts and Unexpired Leases

#### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, any Executory Contract or Unexpired Lease of the Debtors is deemed to be an Assumed Executory Contract or Unexpired Lease, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were assumed, assumed and assigned, or rejected by the Debtors; (2) are identified on the Rejected Executory Contract and Unexpired Lease List; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired

Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Lease List, or the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein or in any other order of the Bankruptcy Court, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors) by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article VI.A of the Plan or pursuant to any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or rejection under applicable federal law. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty (30) days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan conditions, restricts or prevents, or purports to condition, restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease or allows the counterparty thereto to terminate, recapture, impose any penalty, declare a default, condition a renewal or extension, or modify any term or condition upon any assignment of such Executory Contract or Unexpired Lease (including any "change of control" or similar provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Claims and Noticing Agent and served on the Reorganized Debtors by the later of (1) the Claims Bar Date and (2) 30 days after entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Claims and Noticing Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article IX.F of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article IV.B of the Plan and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### 3. Cure of Defaults and Objections to Cure and Assumption

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter, with the amount and timing of payment of any such Cure dictated by the Debtors' ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to Article VI of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim, or Claims set forth on the Schedules, based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to Article VI of the Plan, in the amount and at the time dictated by the Debtors' ordinary course of business, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court and can be expunged from the Claims Register (including by the Claims and Solicitation Agent)**.

## VI. QUESTIONS AND ANSWERS REGARDING THE DEBTORS' RESTRUCTURING PLAN

### A. Who Supports the Plan?

The Debtors and the Consenting Term Loan Lenders that have executed the Restructuring Support Agreement, including holders of in excess of 80% of the outstanding Prepetition Term Loan Claims, support the Plan.

### B. What Will I Receive if the Plan Is Consummated?

Article IV of this Disclosure Statement provides a summary of the anticipated recoveries to Holders of Allowed Claims or Allowed Interests under the Plan, including Administrative Claims, Priority Tax Claims, DIP Claims, and Professional Fee Claims, and each Class of Claims and Interests. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

### C. What happens to my recovery if the Plan is not Confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XII.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 58, and the liquidation analysis attached hereto as **Exhibit C** (the "Liquidation Analysis").

### D. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation" and "Effective Date?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation, there are conditions that the Debtors need to satisfy or the Consenting Term Loan Lenders need to waive before the Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article XII of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 57, for a discussion of the conditions precedent to the Effective Date.

### E. Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and/or to Confirmation of the Plan, which objections potentially could give rise to litigation. See Article X.C.14 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 51.

In the event that it becomes necessary to confirm the Plan over certain Classes' votes to reject the Plan, the Debtors may seek Confirmation of the Plan notwithstanding such dissent. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that an Impaired Class has rejected if it determines that the Plan satisfies

section 1129(b) of the Bankruptcy Code. *See* Article XII.E of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes," which begins on page 59.

**F. Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

Each Holder of an Allowed General Unsecured Claim will receive its Pro Rata share of the GUC Cash Pool, in accordance with the Plan. Thus, recovery to any single Holder of an Allowed General Unsecured Claim will vary based on the number and amount of all Allowed General Unsecured Claims.

**G. How will the preservation of the Causes of Action impact my recovery under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan, or pursuant to Bankruptcy Court order. The Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**H. Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The release, injunction, and exculpation provisions in the Plan (the "Release Provisions") are an integral

part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Term Loan Lenders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the Release Provisions.

Based on the foregoing, the Debtors believe that the Release Provisions are necessary and appropriate and meet the requisite legal standards under Fifth Circuit law. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the Release Provisions. The Release Provisions in the Plan are excerpted below.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE IN FAVOR OF THE PLAN AND DO NOT AFFIRMATIVELY OBJECT TO THE RELEASE PROVISIONS ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES. HOLDERS OF CLAIMS OR INTERESTS IN CLASSES 7 AND 8 WILL BE DEEMED "RELEASING PARTIES" ONLY IF SUCH HOLDER AFFIRMATIVELY OPTS INTO THE THIRD-PARTY RELEASE. THE RELEASE PROVISIONS ARE AN INTEGRAL ELEMENT OF THE PLAN.**

### 1. Releases by the Debtors

**Effective on the Effective Date, except (i) as expressly set forth herein or in the Confirmation Order, and (ii) for the right to enforce the Plan, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions and services of the Released Parties (as defined below) in facilitating the implementation of the Restructuring Transactions contemplated by the Plan, the adequacy of which is hereby confirmed, as of the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, and each of their respective current and former Affiliates, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in its own right, whether individually or collectively, or on behalf of the holder of any Claim against, or Interest in, a Debtor or any other Entity, or that any holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including the capital structure, management, ownership, or operation thereof or otherwise, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the Debtors' in or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL**

**Credit Agreement, the Prepetition Term Loan Credit Agreement, the New Term Loan Facility, the New ABL Facility, the DIP ABL Facility, the DIP Term Loan Facility, the DIP Orders, the Equity Financing, the Restructuring Transactions, the Confirmation Order, the Restructuring Support Agreement, the Chapter 11 Cases, the Plan, including the Plan Supplement, the Disclosure Statement, all other Definitive Documents, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the negotiation, formulation, preparation, dissemination, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Prepetition Term Loan Credit Agreement, the Prepetition ABL Credit Agreement, the New Term Loan Facility, the New ABL Facility, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the Equity Financing, the Restructuring Transactions, or the Plan, the Disclosure Statement, the Filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan and the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (ii) the rights of any holder of Allowed Claims to receive distributions under the Plan; (iii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement; or (iv) any Claims against a Released Party arising from actual fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

**2. Releases by Holders of Claims and Interests**

**Effective on the Effective Date, except (i) as expressly set forth herein or in the Confirmation Order, and (ii) for the right to enforce the Plan, in exchange for good and valuable consideration, including the contributions and services of the Released Parties in facilitating the implementation of the Restructuring Transactions contemplated by the Plan, the adequacy of which is hereby confirmed, each Released Party is hereby deemed expressly, conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Releasing Parties, other than the Debtors or the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all**

**other Entities who may purport to assert any Claim or Cause of Action, remedies, and liabilities, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, or their Estates that such Entity would have been legally entitled to assert in its own right, whether individually or collectively, or on behalf of the holder of any Claim against, or Interest in, a Debtor, a Reorganized Debtor, or their Estates or other Entity, or that any holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including the capital structure, management, ownership, or operation thereof or otherwise, the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between or among any Debtor and any Released Party, the Debtors' in or out-of-court restructuring efforts, intercompany transactions, the Prepetition ABL Credit Agreement, the Prepetition Term Loan Credit Agreement, the New Term Loan Facility, the New ABL Facility, the DIP ABL Facility, and the DIP Term Loan Facility, the DIP Orders, the Equity Financing, the Restructuring Transactions, the Confirmation Order, the Restructuring Support Agreement, the Chapter 11 Cases, the Plan, including the Plan Supplement, the Disclosure Statement, all other Definitive Documents, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their non-Debtor Affiliates, the negotiation, formulation, preparation, dissemination, filing, or consummation of the Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Prepetition Term Loan Credit Agreement, the Prepetition ABL Credit Agreement, the New Term Loan Facility, the New ABL Facility, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the Equity Financing, the Disclosure Statement, the Filing of the Chapter 11 Cases, the Restructuring Transactions, or the Plan, the pursuit of confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan and the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (ii) the rights of any holder of**

**Allowed Claims to receive distributions under the Plan; (iii) any Causes of Action specifically retained by the Debtors pursuant to a schedule of retained Causes of Action to be attached as an exhibit to the Plan Supplement; or (iv) any Claims against a Released Party arising from actual fraud, willful misconduct, or gross negligence, in each case, as determined by a Final Order.**

### 3. Exculpation

**Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each Exculpated Party is released and exculpated from any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Cases, the negotiation of Definitive Documents, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Consummation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes to accept or reject the Plan and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan. In addition, notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under this Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.**

### 4. Injunction

**Except as otherwise expressly provided herein or in the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests or Causes of Action that have been extinguished, released, discharged, settled, or are subject to exculpation, whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interests, along with their respective present or former employees, agents, officers, directors, principals, Affiliates, and Related Parties are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities, in each case, or against the property of such Entities on account of or in connection with or with respect to**

**any such Claims, Interests or Causes of Action unless such holder has timely Filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests or Causes of Action released, discharged, subject to exculpation, or settled pursuant to the Plan.**

**By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.**

**The injunctions set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.**

### I. What is the effect of the Plan on the Debtors' ongoing businesses?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to the Effective Date have been satisfied or waived (*see* Article X of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, each Reorganized Debtor may operate its businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property, enter into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### J. Where can I find out more about the Restructuring Transactions that will be effectuated through the Plan?

More details about specific aspects of the restructuring transactions and the Reorganized Debtors' operations following the Consummation of the Plan can be found in the Plan:

| Provision | Plan Section |
|---|---|
| The Restructuring Transactions | Article V, Section B |
| The sources of consideration for distributions under the Plan | Article V, Section D |
| The corporate existence of the Reorganized Debtors following the Consummation of the Plan | Article V, Section E |
| The Debtors' authorization and approval of corporate action to implement the Restructuring Transactions | Article V, Section F |
| The vesting of assets in the Reorganized Debtors on the Effective Date | Article V, Section G |

| Provision | Plan Section |
|---|---|
| The cancellation of all existing notes, instruments, certificates, shares, or other documents evidencing Claims or Interests on the Effective Date | Article V, Section H |
| Authorization for the Reorganized Debtors to effectuate documents and take further action to implement the terms of the Plan on, or after, the Effective Date of the Plan | Article V, Section K |
| The adoption of the New Organizational Documents of the Reorganized Debtors | Article V, Section I |
| The Reorganized Debtors' directors and officers | Article V, Section J |
| The Reorganized Debtors' preservation of certain Causes of Action | Article V, Section P |
| Settlement and discharge of claims, release of liens, the Release Provisions, and other related provisions | Article IX, Section A - Section I |

## VII. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A. The Debtors' Corporate History

In 1963, Phil Leslie, Jr. founded Leslie's Poolmart, Inc. in North Hollywood, California. Mr. Leslie subsequently expanded Leslie's Poolmart, Inc. into a chain of swimming pool supply stores in the Greater Los Angeles area with his partner Raymond Cesmat. The company grew steadily over the following decades through a combination of new store openings and acquisitions of local and regional pool supply retailers. By the early 2000s, the Debtors had established themselves as the pre-eminent specialty retailer in the U.S. pool and spa care market, and by 2015, the Company operated approximately 910 stores nationwide.

In January 2017, L Catterton, a consumer-focused private equity firm, acquired a majority stake in the Company. Subsequently, in October 2020, Leslie's, Inc. completed its initial public offering on the Nasdaq Global Select Market under the ticker symbol "LESL." The Company continued pursuing its growth strategy by expanding its store footprint to over 1,000 locations, enhancing its digital capabilities, and broadening its service offerings through the acquisition of other pool supply businesses. As set forth above, today the Company operates over 900 retail locations, a robust e-commerce platform, and a professional services division.

### B. The Debtors' Operations

The Debtors operate in the aftermarket pool, hot tub, and spa care industry, which broadly comprises: (i) chemicals; (ii) equipment, parts, and accessories; (iii) the "Hot Tubs" division; and (iv) services. The Debtors offer a comprehensive product range consisting of more than 25,000 products across chemicals, equipment and parts, cleaning and maintenance equipment, safety, recreational, and fitness-related categories. Through their four Company-operated, nationwide distribution centers (the "Distribution Centers"), the Debtors have vertically integrated numerous aspects of their supply chain, packaging, and distribution model.

The Debtors' customers include residential pool owners, residential spa owners, and professional pool operators. As of the Petition Date, the Debtors employed approximately 3,700 employees, including approximately 3,000 employees in the Company's physical network (retail stores and related operations),

approximately 200 in-field service technicians, approximately 300 employees in the corporate office, and approximately 200 employees in the Company's distribution centers.

***Chemicals***. Chemical products represent approximately 50% of the Debtors' sales. The Debtors' chemical products, which are manufactured and packaged at both company-operated facilities and third-party contract packaging facilities, include chlorine products, such as sanitizers and shocks, pH adjusters, specialty chemicals, and filter cleaners. As part of its vertically integrated supply chain, packaging, and distribution model, the Distribution Centers facilitate the end-to-end manufacturing-to-sales process of its chemical products.

***Equipment, Parts, Accessories***. The Debtors sell a broad range of pool and spa equipment, including single-speed and variable-speed pumps, cartridge, sand, and diatomaceous earth filters, gas heaters and heat pumps, salt chlorination systems, LED lighting, and automation and control systems. The Debtors also sell automatic pool cleaners across suction, pressure, and robotic categories. Through subsidiary Horizon Spa & Pool Parts, Inc. ("Horizon"), the Debtors operate a wholesale specialty parts distribution business offering products such as filter elements, pump components, heater parts, and hard-to-find replacement items to professional pool service companies and retailers nationwide. Equipment and parts collectively represent approximately 40% of the Debtors' sales. The majority of the Debtors' equipment and parts sales are generated through their brick-and-mortar retail locations and are supplemented by sales on its e-commerce channels (including third-party marketplaces and the Company's proprietary website).

***"Hot Tubs" Division***. The Debtors' "Hot Tubs" Division is the largest hot tub retail platform in the United States, comprising eight portfolio companies—Aqua Quip, Oregon Hot Tub, International Hot Tubs, Spring Dance Hot Tubs, Capital Hot Tubs, Valley Pool & Spa, Pool City, and Splash Pools and Spas—that collectively operate approximately 50 stores across 10 states. This division's revenue is primarily generated through the sales of hot tubs and spas (including swim spas, saunas, modular pools, and cold plunge products), supplemented by services (*e.g.*, delivery, installation, repair, maintenance, and water treatment services), chemicals, filters and parts, and covers and accessories.

***Services***. The Debtors employ an in-field service network of more than 200 technicians to provide essential on-site equipment installation, maintenance, and repair services for residential consumers and professional pool operators across the United States. Through their proprietary AccuBlue® system, the Debtors' customers receive complimentary, commercial-grade in-store water testing and analysis. The Debtors also continue to assemble an affiliated network of qualified pool professionals through their PRO Partner program, further expanding the Leslie's brand in the professional channel.

**C. The Debtors' Prepetition Capital Structure.**

As of the Petition Date, the Debtors had approximately $807 million in aggregate outstanding principal amount of funded indebtedness. The Debtors do not have any other on-balance sheet funded debt obligations.

| ***Funded Debt*** | ***Principal (in USD)*** | ***Amount*** | ***Outstanding*** |
|---|---|---|---|
| Prepetition ABL Facility | $50,000,000 | | |
| Prepetition Term Loan Facility | $756,700,000 | | |
| ***Total Debt Obligations*** | **$806,700,000** | | |

### 1. Prepetition ABL Facility

Debtor Leslie's Poolmart, Inc. ("Leslie's Poolmart"), Cortz, Inc. ("Cortz"), and LPM Manufacturing, Inc. ("LPM") are borrowers under that certain Credit Agreement dated October 16, 2012 (as amended pursuant to Amendment No. 1, dated as of August 16, 2016, Amendment No. 2, dated as of September 29, 2016, Amendment No. 3, dated as of January 13, 2017, Amendment No. 4, dated as of August 13, 2020, Amendment No. 5, dated as of April 12, 2021, Amendment No. 6, dated as of March 15, 2023, and Amendment No. 7, dated as of April 3, 2024, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement") by and among Leslie's, as holdings, Leslie's Poolmart, as the parent borrower, Cortz and LPM, as subsidiary borrowers, the lenders party thereto from time to time (the "Prepetition ABL Lenders"), Bank of America, N.A., as administrative agent (in such capacity, the "Prepetition ABL Agent") and co-collateral agent, U.S. Bank National Association, as co-collateral agent (the co-collateral agents and Prepetition ABL Agent, together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties"), and the other parties thereto. The Prepetition ABL Credit Agreement provides for a $250 million asset-based revolving credit facility ("Prepetition ABL Facility" and the loans thereunder, the "Prepetition ABL Loans"). Debtors Horizon, Hot Tub Works, LLC ("Hot Tub Works"), Pool Parts, Inc. ("Pool Parts"), RAM Chemical & Supply, Inc. ("RAM Chemical"), SPP Holding Corporation ("SPP"), and Stellar Manufacturing, LLC ("Stellar") guarantee the ABL Facility, which is also secured by a lien on substantially all the Debtors' assets (other than certain subsidiary equity interests, intellectual property, and vehicles, among other standard excluded assets). The Prepetition ABL Facility matures on April 3, 2029, subject to a springing maturity date of December 9, 2027, in the event that the Prepetition Term Loan Facility (as defined herein) has not been extended or repaid in full at that date. As of the Petition Date, the outstanding principal balance of Prepetition ABL Loans was approximately $50 million.

### 2. Prepetition Term Loan Facility

Leslie's Poolmart is the borrower under that certain Amended & Restated Term Loan Credit Agreement, dated March 9, 2021 (as amended by Amendment No. 1, dated as of June 8, 2023, and the Resignation, Consent and Appointment Agreement, dated as of November 14, 2025, and as otherwise amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement"), by and among Leslie's Poolmart, Leslie's, as holdings, Leslie's Poolmart, as the borrower, the lenders from time to time party thereto (the "Prepetition Term Loan Lenders"), Alter Domus (US) LLC, as administrative and collateral agent (the "Prepetition Term Loan Agent," and, together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties;" the Prepetition Term Loan Secured Parties, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), and the other parties thereto. The Prepetition Term Loan Credit Agreement provides for an $810 million secured term loan facility (the "Prepetition Term Loan Facility" and the loans thereunder the "Prepetition Term Loans"). Debtors Horizon, RAM Chemical, Stellar, Pool Parts, Hot Tub Works, SPP, LPM, and Cortz guarantee the Prepetition Term Loan Facility, which is also secured by a lien on substantially all the Debtors' assets (other than certain subsidiary equity interests, certain real estate, and vehicles, among other standard excluded assets). The Prepetition Term Loan Facility matures on March 9, 2028 and accrues interest at Adjusted Term SOFR + 2.75% per annum for Term SOFR loans and ABR +

1.75% per annum for ABR loans. As of the Petition Date, the outstanding principal balance of Prepetition Term Loans was approximately $757 million.

### 3. Intercreditor Agreement

The Prepetition Secured Parties' respective rights with regard to common collateral are set forth in that certain Intercreditor Agreement, dated as of August 16, 2016 (the "Prepetition Intercreditor Agreement"), by and among the Prepetition Secured Parties. The Prepetition Intercreditor Agreement provides, among other things, for the relative priority of the liens securing the Prepetition ABL Facility and the Prepetition Term Loan Facility in certain categories of collateral. Generally, the Prepetition ABL Secured Parties' lien on inventory, accounts receivable, deposit accounts, cash, credit card receivables, and related proceeds (the "Prepetition ABL Priority Collateral") has priority over the Prepetition Term Loan Secured Parties' lien on the same assets. The Prepetition Term Loan Secured Parties' lien on the Debtors' remaining assets (the "Prepetition Term Loan Priority Collateral") has priority over the Prepetition ABL Secured Parties' lien thereon.

## VIII. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. Financial and Operational Headwinds

***Seasonality***. The U.S. pool and spa care industry is inherently seasonal and cyclical, with demand influenced by weather patterns, housing market activity, consumer discretionary spending, and the installed base of residential and commercial pools. For example, the Company structures its business around the busy April through September pool season by negotiating extended payment terms with its suppliers to receive merchandise in December through March, and pays for such merchandise from April through July. The Company generally opens its locations prior to peak selling season and closes its locations after peak selling season ends and begins preparations for the next season.

***COVID-19 and General Economic Conditions***. Following a period of unprecedented demand during the COVID-19 pandemic—driven by increased consumer investment in home improvement and outdoor living amenities, new pool installations, and concerns about product availability, largely driven by a fire at a chlorine production facility in August 2020—the industry experienced a sharp correction beginning in 2023 as pandemic-era demand normalized and macroeconomic conditions deteriorated, driven in part by the factors discussed herein. General economic conditions, including high interest rates, high inflation, uncertain tariffs, declining consumer purchasing power, and consumer confidence have limited the demand for swimming pool and spa related products and services. Economic conditions have also caused a decline in the number of households eligible for new residential pools, reducing the number of new residential pool consumers in the United States. As a result of the declining economic conditions, many customers generally opted for repairs and not replacements of their products, undercutting potential new sales to the Company's existing customer base. Inflation similarly increased the Company's costs, including chemicals, energy, and transportation, limiting the Debtors' ability to withstand weakening demand.

***Housing Market***. The Federal Reserve's interest rate increases beginning in 2022 dampened housing market activity, reducing new pool installations and the associated demand for pool start-up chemicals and equipment.

***Unfavorable Weather Conditions***. The Debtors' business is sensitive to weather conditions, as unseasonably cool weather or significant amounts of rainfall during the peak pool sales season can reduce chemical consumption in pools and spas and decrease consumer purchases of the Debtors' products and services. Further, unseasonably early or late warm weather can vary the length of pool season, thereby

impacting the Company's sales. Unfavorable weather in key pool markets during fiscal years 2024 and 2025, due to factors such as cooler-than-normal temperatures and above-average rainfall, shortened pool seasons and suppressed chemical usage.

***Heightened Competition***. Heightened competition from mass-market retailers, online marketplaces, and regional operators placed pressure on the Debtors' pricing and market share. The United States aftermarket pool and spa care industry is fragmented and competitive, consisting of regional and local independent retailers, home improvement retailers (such as Home Depot, Lowe's, and hardware stores), mass-market, club, and marketplace retailers (such as Walmart, Costco, Amazon, and eBay), and wholesale distributors. Despite the current softer demand environment, big box and online marketplace retailers have been particularly aggressive on pricing, undercutting the Debtors' ability to compete. The Debtors experienced a decline in foot traffic in their retail locations, and their physical and online offerings suffered from overlapping competition from mass-market retailers.

These headwinds had a cumulative and severe impact on the Debtors' financial performance. The Debtors' EBITDA declined from a peak of approximately $270 million in Q3 2021 to $40 million in Q1 2026. The Debtors reported significant net losses and negative free cash flow in fiscal years 2024 and 2025 and Leslie's, Inc.'s stock price declined from a high of approximately $30 per share in 2021 to below $1 per share by mid-2025.

## B. Efforts to Reorganize and Negotiations with Creditors

In response to the challenging financial performance and liquidity constraints, from October 2024 onwards, the Debtors began undertaking a series of cost-reduction and operational efficiency initiatives, including: (a) rationalization of the store footprint through closure of underperforming locations; (b) headcount reductions and organizational restructuring at the corporate level; (c) renegotiation of vendor contracts and optimization of inventory management to reduce working capital requirements; (d) deferral and reduction of capital expenditures; and (e) implementation of pricing and promotional strategies designed to stabilize comparable-store sales trends.

The Debtors also experienced significant management turnover during this period. Between 2024 and 2025, Leslie's Board of Directors appointed new executive leadership resulting in a near-complete turnover of its C-suite, including the appointment of Jeff White as Chief Financial Officer effective October 5, 2025. On November 25, 2025, Leslie's management committed to a plan to close approximately 80 underperforming stores and one distribution center as part of an operational restructuring initiative designed to improve the Company's financial performance. These closures were substantially completed by January 2026. The restructuring reduced the Company's retail footprint by approximately 80 locations across 38 states and reduced the Company's distribution center network from six facilities to five facilities. Moreover, after careful analysis and operational assessments, the Debtors determined that it was prudent to begin exploring capital structure alternatives to address the headwinds that the Company was facing. To that end, the Company engaged Centerview Partners as their investment banker and BRG as a financial advisor to explore strategic alternatives. Working together with counsel, on or around August 2025 the Company and the advisors began engaging the Ad Hoc Group to discuss possible alternatives. Initially, the discussions focused on an out-of-court maturity extension transaction as well as raising new money to capitalize the business and fund growth operations. Between Q4 2025 and Q1 2026, the Company conducted a third-party financing process in parallel to the discussions with the Ad Hoc Group to raise new capital to support the business and position the business for future refinancing. As time progressed and the Company's financial performance continued to face significant headwinds, it became clear that the out-of-court transaction was no longer viable and that the optimal path forward was a holistic restructuring transaction, implemented through an in-court process.

The negotiations between the Debtors and the Ad Hoc Group, which occurred over the approximately fourteen months preceding the Petition Date, culminated in the execution of the Restructuring Support Agreement, dated as of September 30, 2026, by and among the Debtors and holders of in excess of 80% of outstanding claims on account of the Prepetition Term Loans. Pursuant to the Restructuring Support Agreement, the Consenting Term Loan Lenders have pledged their support for a plan of reorganization that reduces the Debtors' funded indebtedness by more than $685 million, provides for $90 million in DIP financing to fund the administration of these chapter 11 cases, and provides for a new $60 million equity investment backstopped by certain of the Consenting Term Loan Lenders. The Debtors' prepetition ABL lenders have also agreed to roll over the Company's existing ABL facility into a DIP ABL facility to fund the Debtors' operations through the chapter 11 cases. The Restructuring Support Agreement and the exhibits thereto embody a comprehensive deleveraging transaction, to be implemented through the Plan, that will best position the Debtors for future success upon their emergence from chapter 11. The Debtors and the Consenting Term Loan Lenders share a strong desire to emerge from these chapter 11 cases as expeditiously as possible. The Debtors intend to conclude these chapter 11 cases by no later than early 2027 to position themselves for success in the upcoming inventory buying season. The Milestones reflect these efforts to facilitate an efficient restructuring of the Debtors' business and capital structure. Accordingly, the Milestones contemplate that the Effective Date will occur by no later than 110 days after the Petition Date.

The Debtors intend to use the chapter 11 process to, as expeditiously as possible, implement the Plan to maximize value for the Debtors' stakeholders while maintaining the Debtors' existing operations. Upon emergence from chapter 11, the Debtors will have a stronger balance sheet, a rationalized retail footprint, and increased flexibility to conduct their operations going forward.

## IX. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A. First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed motions (the "First Day Motions") seeking relief to facilitate the administration of the chapter 11 cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the chapter 11 cases. The First Day Motions, and all orders for relief granted in the chapter 11 cases, are available free of charge at https://restructuring.ra.kroll.com/lesliespool/.

On the Petition Date and at a hearing on October 1, 2026 (the "First Day Hearing"), the Bankruptcy Court entered the following orders granting certain of the relief requested in the First Day Motions:

- *Order Directing Joint Administration of the Chapter 11 Cases* [Docket No. 7];
- *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 10];
- *Interim Order Authorizing the Debtors to (I) Continue to Operate the Cash Management System and Maintain Existing Bank Accounts, (II) Continue Cash Management Programs, and (III) Continue to Perform Intercompany Transactions* [Docket No. 59];

- *Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* [Docket No. 60];

- *Interim Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, (C) Foreign Vendors, and (D) 503(b)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief* [Docket No. 61];

- *Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* [Docket No. 62];

- *Order (I) Establishing Notice and Hearing Procedures for Transfers of Equity Interests in Debtors and Declarations of Worthlessness with Respect to Equity Interests in Leslie's, Inc.; and (II) Granting Related Relief* [Docket No. 63];

- *Order (I) Authorizing the Payment of (A) Certain Taxes and Fees, and (B) Fees to Certain Tax Service Providers; and (II) Granting Related Relief* [Docket No. 64];

- *Order (I) Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Maintain Their Surety and Customs Bond Programs, and (II) Granting Related Relief* [Docket No. 65];

- *Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 66];

- *Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 67] (the "Schedules and Statements Extension Order");

- *Order (I) Authorizing the Debtors to (A) Redact Certain Confidential Information of Customers, and (B) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of, and Provide Notice Directly to, Equity Security Holders, (III) Approving the Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, (IV) Modifying Certain Notice Requirements, and (V) Granting Related Relief* [Docket No. 68]; and

- *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims and (C) Utilize Cash Collateral; (II) Granting Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 74].

### B. Bar Date Motion[4]

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket No. 40] (the "Bar Date Motion") pursuant to which the Debtors propose the following deadlines for persons, entities, and governmental units to file proofs of claim:

- **Claims Bar Date**: December 18, 2026, at 5:00 p.m., prevailing Central Time;
- **Governmental Bar Date**: March 29, 2027, at 5:00 p.m., prevailing Central Time;
- **Rejection Damages Bar Date**: the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the order approving the Debtors' rejection of the applicable executory contract or unexpired lease; and
- **Amended Schedules Bar Date**: the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days from the date on which the Debtors mail notice of the amendment to the Schedules.

The objection deadline for the Bar Date Motion is **Wednesday, October 21, 2026**.

### C. Lease Optimization and Omnibus Contract and Lease Motion[5]

As discussed in the First Day Declaration, the Debtors and the Consenting Term Loan Lenders have built consensus around a value-maximizing restructuring of the Debtors' business. The result of these efforts is the Restructuring Support Agreement, a key component of which is the continuation and completion of the Debtors' ongoing process to rationalize their retail footprint. This process entails, among other things, the closure of certain non- and underperforming stores based on a comprehensive cost-benefit analysis, undertaken with the close coordination of the Debtors' management and advisors.

The Debtors' store closure plan commenced prior to the Petition Date and centers on value maximization for the benefit of the Debtors' stakeholders. To that end, the Debtors, with the assistance of their advisors, are conducting a comprehensive analysis of the Debtors' retail store portfolio, including each store's financial performance and market geography, to identify store locations providing limited or no benefit to the Debtors above the cost of maintaining operations. For such under- and nonperforming stores, the Debtors have determined the best strategy to efficiently transfer inventory to other retail locations that will remain open during and following the chapter 11 cases. This approach will minimize both fiscal and administrative burden by avoiding costly inventory liquidations and their attendant compliance requirements and allowing the Debtors to maximize the value of inventory redistributed from closing stores.

---

[4] Capitalized terms used but not otherwise defined in this subsection have the meanings ascribed to them in the Bar Date Motion (as defined herein).

[5] Capitalized terms used but not otherwise defined in this subsection have the meanings ascribed to them in the Omnibus Contract and Lease Motion (as defined herein) and any related schedules of additional rejections filed in these chapter 11 cases.

The Debtors' retail store rationalization process has accelerated in recent months in connection with the Debtors' restructuring efforts. During the twelve-month period before the Petition Date, the Debtors reduced their store footprint by approximately 80 stores and 1 distribution center (the "Initial Closed Locations"). Moreover, immediately before the Petition Date, the Debtors announced the closure and their intention to vacate an additional 76 stores (the "Wave 1 Stores"), which the Debtors expect to complete within approximately 14 days after the Petition Date. The Debtors continue to evaluate their retail store portfolio and anticipate announcing additional store closures during the chapter 11 cases.

On September 30, 2026, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing, Effective Nunc Pro Tunc to the Rejection Effective Date, (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, (II) Authorizing and Approving Procedures to Reject or Assume Executory Contracts and Unexpired Leases and (III) Granting Related Relief* [Docket No. 25] (the "Omnibus Contract and Lease Motion"). By the Omnibus Contract and Lease Motion, the Debtors seek (a) approval of the rejection of the Initial Rejected Leases, effective *nunc pro tunc* to the applicable Rejection Effective Date, (b) authority to abandon certain Personal Property, and (c) approval of the Contract Procedures for rejecting, assuming, or assigning executory contracts and unexpired leases.

The objection deadline for the Omnibus Contract and Lease Motion is **Wednesday, October 21, 2026**.

### D. Schedules and Statements

On October 1, 2026, the Bankruptcy Court entered the Schedules and Statements Extension Order, extending the Debtors' deadline to submit their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") pursuant to section 521 of the Bankruptcy Code to November 20, 2026.

### E. Milestones

As part of the Debtors' Restructuring Support Agreement, the Debtors agreed, unless such dates are extended or waived in writing by the Debtors and the Required Consenting Term Loan Lenders (as defined in the Restructuring Support Agreement), to the following case milestones to ensure that the Debtors' chapter 11 cases proceed in a structured and expeditious manner towards confirmation:

- no later than three (3) days after the Petition Date, the Debtors shall have delivered the Subscription Procedures and Subscription Form to all Prepetition Term Loan Lenders;
- no later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;
- no later than five (5) Business Days after the Agreement Effective Date, the Transformation Committee shall have been established and shall have held its initial organizational meeting;
- no later than seven (7) days after the Petition Date, the Debtors shall have filed the Omnibus Contract and Lease Motion;
- on or before ten (10) days after the Petition Date, the Debtors shall have filed a motion requesting, and within thirty-five (35) days after the Petition Date shall have obtained, an

order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days;

- no later than twenty (20) days after the Petition Date, the Debtors shall have filed the Plan and Disclosure Statement;
- no later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;
- no later than fifty-five (55) days after the Petition Date, the Bankruptcy Court shall have entered the order approving the Disclosure Statement;
- no later than one hundred (100) days after the Petition Date, the Bankruptcy Court shall have entered the order confirming the Plan; and
- no later than one hundred and ten (110) days after the Petition Date, the Effective Date shall have occurred.

## X. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1. There Is a Risk of Termination of the Restructuring Support Agreement

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Plan's Confirmation or Consummation, which could result in the loss of support for the Plan by important creditor constituencies, including the withdrawal of such creditors' votes to accept the Plan, and could result in the loss of access to DIP financing and/or use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to Confirm and Consummate the Plan.

#### 2. The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions Are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.

If the Restructuring Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, pursuing a chapter 11 liquidating plan, converting the Chapter 11 Cases to cases under chapter 7, or a different chapter 11 plan or any other transaction that would maximize the value of the Debtors' Estates. The terms of any such restructuring alternatives may be less favorable to Holders of

Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;
- the Debtors' liquidity;
- how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies;
- the Debtors' enterprise value; and
- the Debtors' business relationships with customers and vendors.

**3. Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests that each encompass Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**4. The Conditions to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions. If such conditions are not met or waived, the Effective Date will not take place.

**5. The Debtors May Fail to Satisfy Voting Requirements**

If the Debtors receive votes in number and amount sufficient to enable the Bankruptcy Court to Confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. If the Debtors do not receive sufficient votes, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Allowed Claims as the Restructuring Transactions proposed in the Plan and the Debtors do not believe that any transaction exists or is likely to exist that would be more beneficial to the Estates than the Restructuring Transactions. Moreover, an alternative plan or transaction could result in the termination of the Restructuring Support Agreement and the loss of the Consenting Term Loan Lenders' support.

### 6. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, the Bankruptcy Court's findings that: (a) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless the plan contemplates such liquidation or reorganization; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Debtors will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code and/or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that the Plan does not meet all of the statutory requirements for Confirmation. If the Bankruptcy Court does not Confirm the Plan, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Interests and Allowed Claims will ultimately receive with respect to their Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan and Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 7. Nonconsensual Confirmation

If an impaired class of claims or interests does not, or is deemed not to, accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan, and, as to each impaired class that has not accepted or is deemed not to accept the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements and that the Bankruptcy Court may therefore Confirm the Plan in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of the Plan's nonconsensual Confirmation may result in, among other things, increased expenses relating to professional compensation.

### 8. The Debtors May Exhaust Their Cash Collateral and/or Postpetition Financing

If the chapter 11 cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

#### 9. Continued Risk Upon Confirmation

Even if the Debtors Consummate the Plan, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products and services, and increasing expenses. *See* Article X.C of this Disclosure Statement, entitled "**Risks Related to the Debtors' and the Reorganized Debtors' Businesses**," which begins on page 47. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that any chapter 11 plan of reorganization, including the Plan, will achieve the Debtors' stated goals.

In addition, at the outset of the chapter 11 cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the chapter 11 cases. Adequate funds may not be available when needed or may not be available on favorable terms.

#### 10. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. Upon conversion, a chapter 7 trustee is appointed or elected to liquidate the debtor's assets for distribution in accordance with the Bankruptcy Code's priority scheme. The Debtors believe that liquidation under chapter 7 would result in significantly lower distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

#### 11. The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan and the Restructuring Support Agreement, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Holders of Claims and Interests may not rely on the estimates set forth in this Disclosure Statement where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 12. One or More of the Chapter 11 Cases May Be Dismissed

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

### 13. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. Moreover, failure to comply with the Restructuring Support Agreement's milestones could result in the termination of the Restructuring Support Agreement and the withdrawal of the Consenting Term Loan Lenders' votes in favor of the Plan. As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions. If the Debtors do not meet the conditions or the Consenting Term Loan Lenders do not waive them, the Effective Date will not take place.

### 14. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

A variety of contingencies may affect the distributions available to Holders of Allowed Claims under the Plan, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Interests to be subordinated to other Allowed Claims and Interests. The occurrence of any and all such contingencies will not affect the validity of Holders' votes to accept or reject the Plan or require any sort of revote.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

### 15. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article IX of the Plan sets forth the Release Provisions, including a release of liens and releases of Claims that may otherwise be asserted against the Debtors, Reorganized Debtors, or the Released Parties, as applicable. The Release Provisions under the Plan are subject to objection by parties in interest and may not be approved. If the Release Provisions are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, but only if they receive the full benefit of the Release Provisions. The Release Provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries under the Plan

### 1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections attached hereto as **Exhibit D** (the "Financial Projections") represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. Although the Debtors believe that the Financial Projections in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the Reorganized Debtors' financial condition and results of operations from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed. Among other things, estimates will fluctuate based on general economic and business conditions, capital market conditions, and industry-specific and Company-specific factors (including the ability of the Reorganized Debtors to achieve strategic goals, objectives, and targets over applicable periods).

### 3. Estimated Valuations of the Debtors and the New Common Equity, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' Interests. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer relationships.

### 4. Certain Tax Implications of the Plan

Holders of Allowed Claims and Interests should carefully review Article XIV of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 65 to determine how the U.S. federal income tax implications of the Plan and the chapter 11 cases may affect the Debtors, the Reorganized Debtors, and Holders of certain Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

#### 5. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions, and to certain financial, business, legislative, regulatory, climate, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium (if any), and interest and/or fees on their indebtedness.

#### 2. The Debtors Are Subject to the Conditions of the General Economy

Unfavorable economic conditions may adversely affect the Debtors' business, financial condition or results of operations. The Debtors are vulnerable to general economic downturns. Any decline in customer demand and spending resulting from a general economic downturn could materially and adversely affect the Debtors' business, financial condition or results of operations. A prolonged period of sluggish economic conditions has had and may continue to have an adverse impact on the level of maintenance expenditures of the Debtors' customers and their ability to maintain historic levels of these expenditures. As a result of significantly increased volatility and instability in the financial markets and unfavorable economic conditions, it is difficult for the Debtors, their customers, and their suppliers/vendors to forecast demand trends accurately. The Debtors are unable to accurately predict the extent or duration of cycles or their effect on the Debtors' financial condition or results of operations and can give no assurance as to the timing, extent or duration of the current or future business cycles.

#### 3. Loss of Key Management or Personnel Could Negatively Impact the Debtors' Business

The Debtors have an experienced management team and key personnel who have played, and continue to play, critical roles in the Debtors' operations and restructuring efforts. Each member of the management team is uniquely qualified by virtue of his or her substantial industry expertise and proven leadership experience. The management team has a deep understanding of the pool and spa care industry and strong relationships with the numerous vendors on which the Debtors rely to provide the products and services that the Debtors' customers expect.

The Debtors believe that their ability to be successful in the future will be due, in large part, to their management team and key personnel. Losing the services of one or more members of the Debtors' management team or key personnel could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

#### 4. The Difficulty of Attracting and Retaining Qualified Employees Could Detrimentally Impact the Debtors' Business

The Debtors depend on their ability to find, hire and retain qualified employees to manage day-to-day business activities. The Debtors also need qualified and competent personnel to execute their business plans and serve their customers. The Debtors' inability to recruit and retain qualified and competent managers and personnel could have a material adverse effect on their business, financial condition, and results of operations.

#### 5. The Debtors' Success Is Dependent on Factors Affecting Consumer Spending Outside of the Debtors' Control

General economic conditions and other factors including levels of employment, disposable consumer income, prevailing interest rates, consumer debt and availability of credit, costs of fuel, inflation, recession and fears of recession, war and fears of war, pandemics (such as the COVID-19 pandemic), inclement weather, tariff policies, tax rates and rate increases, timing of receipt of tax refunds, consumer confidence in future economic conditions and political conditions, and consumer perceptions of personal well-being and security affect consumer spending. Unfavorable changes in factors affecting discretionary spending could reduce demand for the Debtors' products and services resulting in lower revenue and negatively impacting their businesses and financial results.

#### 6. Weather Conditions and Seasonality May Affect Demand for the Debtors' Products and Services

The Debtors supply pool and spa care products and services to residential, professional, and commercial customers, the demand for which weather conditions including, without limitation, potential impacts of global climate change, unseasonably cool or cold weather, significant rainfall, and frequent storms, affect directly. For example, unseasonably cool or cold weather may shorten or, in severe circumstances, essentially eliminate "pool season" in the markets in which the Debtors operate. Such shortened seasons typically result in depressed sales and service revenues. Moreover, drought and water-management restrictions also depress sales and slow pool installations.

In addition, the Debtors' operations are significantly seasonal. The Debtors routinely report higher sales in the third and fourth fiscal quarters (encompassing April through September) and lower sales in the first and second fiscal quarters (encompassing November through March). The seasonal spike in buying early in the pool season requires that the Debtors accumulate inventory in advance based on forecasted demand to ensure that the Debtors' retail locations and distribution centers are appropriately stocked to fulfill customer needs. Accordingly, delays or changes in the beginning of pool seasons substantially affect the Debtors' ability to convert their inventory to cash and to pay their vendors. Consequently, the Debtors results, operations, and financial position may vary from year-to-year, quarter-to-quarter, and month-to-month. If the Debtors are unable to effectively manage seasonality and adverse weather conditions of their business, the Debtors' results of operations, financial position, and cash flows may be adversely affected.

**7. The Debtors' Business and Operating Results Will Be Adversely Affected if They Do not Manage their Inventory Levels or Fail to Maintain Positive Relationships With Their Vendors**

The Debtors' business requires them to manage a large volume of inventory effectively and maintain positive relationships with vendors. The Debtors must continue to maintain sufficient inventory levels and maintain their relationships with vendors to operate their business successfully. However, the Debtors also must avoid accumulating excess inventory as they seek to minimize out-of-stock levels across all product categories and to maintain in-stock levels. As a result, the Debtors may experience difficulty in responding to changes in the retail environment generally as well as any changes to their vendor relationships specifically, which makes them vulnerable to changes in price and consumer preferences. If the Debtors do not accurately anticipate the future demand for a particular product or the time it will take to obtain new inventory, their inventory levels will not be appropriate, and the results of operations may be negatively impacted.

**8. The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

Certain of the Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws and evolving environmental standards. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

**9. The Debtors' Failure to Invest in and Adapt to Technological Developments and Industry Trends Could Harm their Business**

The Debtors rely heavily on their information technology systems to operate their business, including retail, financial, planning, sourcing and merchandising systems, and have made, and expect to continue to make, significant investments to upgrade, enhance or replace certain of these systems. The satisfactory performance, reliability and availability of the Debtors' website and mobile app, transaction-processing systems and technology infrastructure are critical to their reputation and ability to acquire and retain customers, as well as maintain adequate customer service levels. The Debtors have experienced, and in the future may experience, interruptions, delays and outages in service and availability from time to time due to a variety of factors, including infrastructure changes, human or software errors, website hosting disruptions and capacity constraints.

To remain competitive, the Debtors must continue to enhance and improve the responsiveness, functionality and features of their website, mobile app and other information technology systems, which is particularly challenging given the rapid rate at which new technologies, customer preferences and expectations, and industry standards and practices are evolving in the e-commerce industry.

**10. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the chapter 11 cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, Confirm, and Consummate the Plan and the Restructuring Transactions specified therein; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the chapter 11 cases from time to time; (c) ability to maintain relationships with

suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the chapter 11 cases to chapter 7 cases; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the chapter 11 cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the chapter 11 cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the Bankruptcy Court's prior approval for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the chapter 11 cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the chapter 11 cases that may be inconsistent with the Debtors' plans.

### 11. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful Confirmation and implementation of the Plan and the Restructuring Transactions. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the chapter 11 cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the chapter 11 cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the chapter 11 cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the chapter 11 cases. If the chapter 11 proceedings last longer than anticipated, the Debtors will require additional debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to the Plan. Even after the Plan is approved and implemented, possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection may adversely affect the Reorganized Debtors' operating results.

### 12. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the chapter 11 cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract and lease terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated

financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to the Plan. The Debtors may also be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852, *Reorganizations*, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may materially differ from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections attached hereto as **Exhibit D** do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

**13. The Debtors Operate in a Highly Competitive Industry**

The pool and hot tub supplies industry is highly competitive. The Debtors compete for customers primarily with big box stores, online-only platforms, and other specialty retailers. If the Debtors do not compete effectively, their results of operations could be adversely affected.

**14. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation to which the Reorganized Debtors may become party nor the final resolution of any such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**15. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arose before the Petition Date or before Confirmation of the Plan (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through the Plan could be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**16. The Reorganized Debtors May Not Be Able to Generate or Receive Sufficient Cash to Service All of Their Indebtedness and May Be Forced to Take Other Actions to Satisfy their Obligations, Which May Not Be Successful**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and/or fees on their indebtedness. In

addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

If cash flows and capital resources are insufficient to fund the Reorganized Debtors' debt obligations, they could face substantial liquidity problems and might be forced to reduce or delay investments and capital expenditures, or to dispose of assets or operations, seek additional capital or restructure or refinance debt, including the New ABL Facility. These alternative measures may not be successful, may not be completed on economically attractive terms, or may not be adequate to satisfy their debt obligations when due.

Further, if the Reorganized Debtors suffer or appear to suffer from a lack of available liquidity, the evaluation of their creditworthiness by counterparties and rating agencies and the willingness of third parties to do business with them could be adversely affected.

#### 17. Trading in Common Stock During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks

All of the Debtors' funded indebtedness is senior to the Existing Equity Interests in the Debtors' capital structure. The Plan contemplates that the Debtors' Existing Equity Interests will be cancelled and discharged on the Effective Date and that Holders of Existing Equity Interests will not be entitled to a recovery. Accordingly, any trading in Leslie's common stock during the pendency of the chapter 11 cases is highly speculative and poses substantial risks to purchasers of common stock.

### D. Risks Related to the Offer and Issuance of Securities Under the Plan

#### 1. A Liquid Trading Market for the Shares of New Common Equity May Not Develop

Following emergence from chapter 11, Reorganized Leslie's will not be a publicly traded company. As the Reorganized Debtors do not expect that the New Common Equity will be listed on a securities exchange following emergence from chapter 11, it is unlikely that there will be a liquid trading market for the shares of New Common Equity. To the extent there is a trading market for the New Common Equity, the liquidity of any market for New Common Equity will depend upon, among other things, the number of holders of shares of New Common Equity, the Debtors' financial performance and prospects, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the New Common Equity will develop (or if developed, that such active trading market will be sustained), nor can the Debtors give any assurance as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Equity at a time or price that you consider reasonable may be substantially limited.

Accordingly, you may be required to bear the financial risk of your ownership of the New Common Equity indefinitely. Following emergence from chapter 11, the Reorganized Debtors do not expect to remain subject to the reporting requirements of the Exchange Act, and Holders of the New Common Equity will not be entitled to any information except as expressly required by the New Organizational Documents. As a result, the information which the Debtors are required to provide the holders of New Common Equity on an ongoing basis is expected to be less than the Debtors would be required to provide if the New Common Equity were registered under the Exchange Act or listed on a national securities exchange. This lack of information could impair your ability to evaluate your ownership and impair the marketability of the New Common Equity.

### 2. The Trading Price for the New Common Equity May Be Depressed Following the Effective Date

Holders of Claims that receive the New Common Equity may seek to liquidate such securities in an effort to generate cash proceeds. These sales and the volume of New Common Equity available for trading could cause the trading price for the New Common Equity to be depressed, particularly in the absence of an established trading market for the New Common Equity.

Furthermore, the trading value of the New Common Equity is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Equity to rise and fall.

### 3. Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Equity would rank below all debt claims against the Reorganized Debtors, including the New ABL Facility and the New Term Loan Facility. As a result, holders of the New Common Equity will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 4. No Intention to Pay Distributions

The Reorganized Debtors do not, at this time, intend to pay any distributions on the New Common Equity, nor are any distributions guaranteed to be paid at any time. Any distributions remain subject to the sole discretion of the New Board of the Reorganized Debtors. In addition, covenants in the documents governing the Reorganized Debtors' indebtedness may restrict their ability to pay cash distributions and may prohibit the payment of distributions and certain other payments. As a result, the success of an investment in the New Common Equity may depend entirely upon any future appreciation in the value of the New Common Equity. There is, however, no guarantee that the New Common Equity will appreciate in value.

### 5. Certain Holders of the New Common Equity May Be Restricted in Their Ability to Transfer or Sell Their Interests

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Equity (other than the Equity Financing Securities) on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims, in accordance with the terms of the Plan, shall be exempt from the registration and prospectus delivery requirements of the Securities Act and any other applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. In addition, pursuant to Section 4(a)(2) of the Securities Act, the offering, issuance, and distribution of the Equity Financing Securities is exempt from the registration and prospectus delivery requirements of the Securities Act and any applicable federal, state, or local law requiring registration and/or delivery of prospectuses prior to the offering, issuance, distribution, and sale of a security. Such New Common Equity (including Equity Financing Securities) issued under Section 4(a)(2) of the Securities Act will be considered "restricted securities," will bear customary legends and

transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and other applicable law. The New Common Equity underlying the MIP will be issued pursuant to an available exemption from the registration requirements under the Securities Act and other applicable law. Holders of restricted securities will, however, be permitted to resell New Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such securities are registered with the SEC.

Pursuant to section 1145(a)(1) of the Bankruptcy Code, the New Common Equity issued on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims (other than the Equity Financing Securities) may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Any resale by a Holder of a Claim that receives New Common Equity pursuant to the Plan that is deemed to be an "underwriter" would not be exempted pursuant to section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Any such Holder would only be permitted to sell such securities without registration if they comply with an applicable exemption from registration, including, for example, Rule 144 under the Securities Act.

Any Holder receiving Equity Financing Securities would only be permitted to sell such securities without registration if they comply with an applicable exemption from registration, including, for example, Rule 144 under the Securities Act.

The New Common Equity is not expected to be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Equity to freely resell the New Common Equity. See Article XIII to this Disclosure Statement, entitled "Certain Securities Law Matters," for additional discussion.

**6. Significant Holders of New Common Equity May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date.**

Assuming that the Effective Date occurs, certain Holders of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims may acquire a significant ownership interest in the New Common Equity issued pursuant to the Plan and the Equity Financing. If such Holders were to act as a group (either informally or within the meaning of Rule 13d-5 under the Exchange Act), such Holders may be in a position to control the outcome of all actions requiring equityholder approval, including the election of managers or members, as applicable, without the approval of other equityholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Equity. In addition, a Holder of a significant amount of New Common Equity may sell all or a large portion of its New Common Equity within a short period of time, which sale may adversely affect the trading price of the New Common Equity. A Holder of a significant amount of New Common Equity may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by Holders of a significant amount of New Common Equity may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 7. Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

Upon the Effective Date, the New Common Equity issued under the Plan on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145(a) of the Bankruptcy Code. Holders of New Common Equity that are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions on their ability to resell those securities pursuant to the Securities Act. To the extent section 1145(a)(1) of the Bankruptcy Code does not provide a registration exemption to securities issued pursuant to the Plan, such securities shall be issued pursuant to Section 4(a)(2) of the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities, which includes the Equity Financing Securities, may not be entitled to have their restricted securities registered and may be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding ninety (90) days may resell restricted securities under Rule 144 after a one-year holding period. An affiliate may also resell restricted securities under Rule 144 after a one-year holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144. Since the Reorganized Debtors do not plan to register or apply to list any of their securities on a national stock exchange, there can be no assurance that there will be current public information available about the issuer of the New Common Equity.

The Debtors make no representation regarding the right of any Holder of New Common Equity to freely resell the New Common Equity. Resale restrictions are discussed in more detail in Article XIII to this Disclosure Statement, entitled "Certain Securities Law Matters."

### 8. Restrictions May Be Placed on the New Common Equity Following the Effective Date

If as of the Effective Date the Debtors expect to qualify for the 382(l)(5) Exception (as defined herein) and not elect out of its application, the New Organizational Documents, with the consent of the Required Consenting Term Loan Lenders, may include certain restrictions and information procedures with respect to transfers with respect to the New Common Equity to minimize the likelihood of a subsequent "ownership change" and thus protect the value of its available tax attributes. For further information on the potential restrictions and procedures, *see* Article XIV.B.2 of this Disclosure Statement, entitled "Cancellation of Debt and Reduction of Tax Attributes."

### 9. The New Common Equity Is Subject to Dilution

The ownership percentage represented by the New Common Equity distributed on the Effective Date under the Plan will be subject to dilution from New Common Equity (or equity-based awards in respect thereof) issued pursuant to the MIP and from any other equity securities that the Reorganized Debtors may issue after the Effective Date. In the future, similar to other companies, additional equity financings or other equity issuances by the Reorganized Debtors could adversely affect the value of the New Common Equity. The amount of the dilutive effect of any of the foregoing could be material.

## XI. SOLICITATION, VOTING, AND NEW EQUITY ELECTION PROCEDURES

The Debtors are distributing this Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, to the Holders of Claims in the Classes entitled to vote to accept or reject the Plan.

| |
|---|
| **The description of the solicitation and voting process set forth in this Disclosure Statement is a summary only. Please refer to the Disclosure Statement Order and Solicitation Procedures for a more comprehensive description of the solicitation and voting process.** |

### A. Holders of Claims Entitled to Vote on the Plan

Under the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The tables in Article IV of this Disclosure Statement, entitled "Classification of Claims and Interests under the Plan" and "Summary of Expected Recoveries," which begin on page 7, provide a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class, absent an objection to such Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 3B and 4 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, the Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from holders of Claims or Interests in Classes 1, 2, 5, 6, 7, and 8.

### B. Voting Record Date

**The Voting Record Date is November 13, 2026** (the "Voting Record Date"). The Voting Record Date is the date on which the Debtors will determine which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, may vote to accept or reject the Plan as the Holder of the assigned or transferred Claim.

### C. Voting on the Plan

**The Voting Deadline is December 16, 2026 at 4:00 p.m. (prevailing Central Time)**. To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your Ballot indicating your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline. Ballots returned by facsimile will not be counted.

If you are a Holder of a Claim in a Voting Class, you must complete, sign, and date your Ballot and return it (with an original signature) ***promptly*** in the enclosed reply envelope or to one of the following addresses:

| **If sent by first-class mail, hand delivery or overnight mail:** | **If via online portal:** |
| --- | --- |
| Leslie's, Inc. Ballot Processing Center<br>c/o Kroll Restructuring Administration LLC<br>850 3rd Avenue, Suite 412<br>Brooklyn, NY 11232<br><br>To arrange hand delivery of your Ballot, please email lesliespoolballots@ra.kroll.com (with "Leslie's – Hand Delivery of Ballot" in the subject line) at least 24 hours prior to your arrival at the address above and provide the anticipated date and time of delivery. | Submit your Ballot via the Solicitation Agent's online portal, by visiting https://restructuring.ra.kroll.com/lesliespool.<br><br>Click on the "Submit E-Ballot" link under the Case Action Navigation section of the website and follow the instructions to submit your Ballot.<br><br>Voting through the Solicitation Agent's online portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile or email will not be counted. Creditors who cast a Ballot using the online portal should NOT also submit a paper Ballot. |

**If you have any questions about the solicitation or voting process, please contact the Solicitation Agent at (844) 408-3397 (toll free) or +1 (646) 825-3745 (international) or via electronic mail to lesliespoolinfo@ra.kroll.com.**

### D. Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim submitting such Ballot; (2) it was transmitted by means other than as specifically set forth in the Ballot; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the Prepetition ABL Agent, the Prepetition Term Loan Agent, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (5) it is unsigned; and/or (6) it is not clearly marked as a vote to either accept or reject the Plan, or it is marked as a vote both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED BY THE SOLICITATION AGENT AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE XI WILL NOT BE COUNTED.**

## XII. CONFIRMATION OF THE PLAN

### A. Requirements for Confirmation of the Plan

Among the requirements for the Plan's Confirmation pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class of claims or interests, that each holder of a claim or interest of such class will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

Attached hereto as **Exhibit C** is a Liquidation Analysis the Debtors prepared with the assistance of their restructuring advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions the Plan contemplates. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court does not confirm the Plan, and the Debtors fail to propose and Confirm an alternative plan of reorganization, the Debtors' assets may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business and assets. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of BRG, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections, comprising their projected consolidated balance sheet, income statement, and statement of cash flows. Creditors and other interested parties should review Article X of this Disclosure Statement, entitled "Risk Factors," which begins on page 41, for a discussion of certain factors that may affect the Reorganized Debtors' future financial performance.

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable going concern following the Plan's Consummation and that the Plan therefore meets the feasibility requirements of the Bankruptcy Code.

### D. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is

not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[6]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article IV.F of the Plan, if a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

## E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Holders of Existing Equity Interests in Class 7 and Section 510(b) Claims in Class 8 are conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code because they will not receive a distribution under the Plan. Accordingly, the Plan must satisfy the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Plan, as proposed, satisfies the cramdown requirements such that the Bankruptcy Court may Confirm the Plan. Subject to the terms and conditions of the Plan and the Restructuring Support Agreement, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment among classes of equal priority be the same or equivalent. Instead, any different or discriminatory treatment must

[6] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

not be "unfair." Bankruptcy courts take into account a number of factors in determining whether a plan discriminates unfairly.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims or interests in the class. Moreover, the fair and equitable test includes the "absolute priority rule," pursuant to which no class of claims or interests junior to an impaired, dissenting class of claims receives or retains property under the plan on account of such junior claim or interest, unless each holder in the senior impaired dissenting class receives 100 percent of such holder's claim.

The Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" test, including the absolute priority rule. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank or have consented to any different treatment. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. As discussed, the absolute priority rule applies only to an impaired, dissenting class of unsecured claims or interests. The Plan is structured such that, if Holders of General Unsecured Claims in Class 4 vote to reject the Plan, the Plan nevertheless satisfies the absolute priority rule because no Class of Claims or Interests junior to General Unsecured Claims will receive a distribution under the Plan. The Plan and the treatment of all Classes of Claims or Interests under the Plan therefore satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Reorganized Debtors

In conjunction with formulating the Plan and satisfying their obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to provide an estimate of the Reorganized Debtors' post-Confirmation going concern value. Accordingly, an analysis regarding the Reorganized Debtors' post-Confirmation going concern value is attached hereto as **Exhibit E** (the "Valuation Analysis") and incorporated herein by reference. As set forth in the Valuation Analysis, the Reorganized Debtors' going concern value is substantially less than the aggregate amount of the Debtors' funded debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XIII. CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Common Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable Blue Sky Law. The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Common Equity by the Reorganized Debtors pursuant to the Plan and the Equity Financing is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Laws. The New Common Equity (other than the Equity Financing Securities) on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims will be issued without registration under the Securities Act, state securities laws, or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code. In addition (and to the extent that section 1145 of the Bankruptcy Code shall be deemed not to apply to any New Common Equity), pursuant to Section 4(a)(2) of the Securities Act or another available exemption from registration, the offering, issuance and distribution of New Common Equity (including the Equity Financing Securities) is exempt from

registration and prospectus delivery requirements of the Securities Act, state securities laws, or any similar federal, state, or local law, as described in more detail below.

No registration statement will be filed under the Securities Act, or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan.

### A. Issuance of New Common Equity in Reliance on Section 1145

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution by the Reorganized Debtors of the New Common Equity.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any other applicable federal, state, or local law requirements for the issuance of a security do not apply to the offer, issuance, distribution, or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash or property. The Debtors believe that the issuance of the New Common Equity in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

As discussed herein, holders of the Prepetition Term Loan Claims that qualified as either (a) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act or (b) an institutional "accredited investor" (an "IAI") within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act, or an entity in which all of the equity investors are IAIs (which, in the case of (a) and (b), for the avoidance of doubt, may not include any natural person) were offered the opportunity to commit to subscribe to purchase such holders' pro rata portion of a portion of New Common Equity in the Equity Financing. The offer, issuance, sale and distribution by the Debtors and the Reorganized Debtors of the Equity Financing Securities (including the New Common Equity issued on account of the Equity Financing Backstop Premium) was and will be made in reliance on the exemption from the registration requirements of the federal securities laws pursuant to Section 4(a)(2) of the Securities Act, or another available exemption from registration.

Accordingly, no registration statement will be filed under the Securities Act or any applicable federal, state, or local securities laws. Recipients of the New Common Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### B. Subsequent Transfers of New Common Equity (other than Equity Financing Securities)

The New Common Equity received on account of the DIP Term Loan Claims and Allowed Prepetition Term Loan Claims may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the New Common Equity received pursuant to section 1145 are exempt from registration under the Securities Act and state securities laws, unless the holder is deemed to be an "underwriter" with respect to such securities. The exemptions provided for in section 1145 of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for

the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

An entity that is not an "issuer" (as such term is used in section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act) is not deemed an underwriter under section 1145(b)(1) of the Bankruptcy Code with respect to 'ordinary trading transactions' in securities received under section 1145(a)(1). What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the SEC. Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the Plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act, or (iii) payment of special compensation to brokers or dealers in connection with the sale. The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(a)(11) of the Securities Act purports to include as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, while there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of New Common Equity by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Equity who are deemed to be "underwriters" may be entitled to resell their New Common Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if (in the case of restricted securities) the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer." Parties which believe they may be underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel as to the availability of the exemption provided by Rule 144. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Equity would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Equity and, in turn, whether any Person may freely resell such New Common Equity.

The SEC's staff has indicated that a 'safe harbor' under Rule 144 is available for the immediate resale of securities issued under a plan of reorganization to affiliates of the issuing debtor that would otherwise be unrestricted under the Securities Act. The Rule 144 safe harbor should therefore be available for resales of New Common Equity issued to affiliates under the Plan. The availability of the Rule 144 safe harbor is conditioned on the public availability of certain information concerning the issuer and imposes on selling stockholders that are affiliates certain volume limitations and certain manner of sale and notice requirements.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan. Thus, no person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any securities that may be deemed to occur in connection with voting on the Plan.

### C. Issuance of Equity Financing Securities in Reliance on Section 4(a)(2)

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering is exempt from registration under the Securities Act.

The Debtors believe that the Equity Financing Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act. The Equity Financing Securities will be considered “restricted securities” and will be subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

### D. Subsequent Transfers of Equity Financing Securities

The Equity Financing Securities will be deemed “restricted securities” (as defined in Rule 144(a)(3) of the Securities Act), will bear customary legends and transfer restrictions and may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available. If in the future a Holder of Equity Financing Securities decides to offer, resell, pledge, or otherwise transfer any Equity Financing Securities, such Equity Financing Securities may be offered, resold, pledged, or otherwise transferred only (a) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer (as defined in Rule 144A promulgated under the Securities Act) in a transaction meeting the requirements of Rule 144A, (b) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (c) pursuant to an exemption from registration under the Securities Act (including the limited safe harbor provided by Rule 144) (to the extent available), or (d) pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, in each of cases (a)–(d) in accordance with any applicable securities laws of any state of the United States. Such Holder will, and each subsequent Holder is required to, notify any subsequent acquiror of the Equity Financing Securities from it of the resale restrictions referred to above, if applicable.

Rule 144 provides a limited safe harbor for the resale of restricted securities (such that the seller is not deemed an “underwriter”) if certain conditions are met. These conditions vary depending on whether the seller of the restricted securities is an “affiliate” of the issuer. Rule 144 defines an affiliate as “a person

that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities pursuant to Rule 144 after a one-year holding period whether or not there is current public information regarding the issuer available and without compliance with the volume, manner of sale, and notice requirements described below.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144. *First*, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. (In the case of debt securities, the amount of debt securities sold for the account of an affiliate in any three-month period may not exceed the greater of the limitation set forth in the preceding sentence or 10% of the principal amount of the applicable tranche of debt securities.) *Second*, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). *Third*, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or other units or has an aggregate sale price greater than $50,000, an affiliate must electronically file or cause to be filed a copy of a notice of proposed sale on Form 144 via the SEC's EDGAR filing system.

The Debtors believe that the Rule 144 exemption will not be available with respect to any Equity Financing Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of Equity Financing Securities will be required to hold their Equity Financing Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. The Debtors expect that, after the Effective Date, the issuer of the Equity Financing Securities will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act.

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any Equity Financing Security shall, upon issuance, be stamped or otherwise imprinted with, or be deemed to contain, a restrictive legend substantially consistent with the following form:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Reorganized Debtors reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the Equity

Financing Securities. The Reorganized Debtors also reserve the right to stop the transfer of any Equity Financing Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive Equity Financing Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any Equity Financing Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the Equity Financing Securities will be subject to the other restrictions described above.

In addition to the foregoing restrictions, the Equity Financing Securities will also be subject to any applicable transfer restrictions in the New Organizational Documents, or in agreements or instruments applicable to holders of such Equity Financing Securities.

Persons who receive New Common Equity (including Equity Financing Securities) under the Plan or pursuant to the Equity Financing are urged to consult their own legal advisor with respect to the restrictions applicable under the federal or state securities laws and the circumstances under which securities may be sold in reliance on such laws. The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. We make no representations concerning, and do not provide, any opinions or advice with respect to the New Common Equity or the bankruptcy matters described in this Disclosure Statement. In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each recipient of securities and party in interest to consider carefully and consult with its own legal advisors with respect to all such matters. Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular recipient of New Common Equity may be an underwriter, we make no representation concerning the ability of a person to dispose of the New Common Equity issued under the Plan.

## XIV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Prepetition ABL Claims, Prepetition Term Loan Claims, and General Unsecured Claims. This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those summarized herein. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or to Holders of Prepetition ABL Claims, Prepetition Term Loan Claims, or General Unsecured Claims in light of their individual circumstances. This discussion

does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, broker-dealers, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Holders of Claims whose functional currency is not the U.S. dollar, Holders of Claims who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, former citizens and long-term residents of the United States and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). Moreover, this summary does not address any aspect of U.S. non-income (including estate or gift), state, local, or non-U.S. taxation, considerations under any applicable tax treaty or any tax arising under section 1411 of the IRC (the "Medicare" tax on certain investment income). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single class and holds such Claims and New Common Equity, as applicable, as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This discussion also assumes that none of the Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes and that each of the Prepetition ABL Claims, the Prepetition Term Loan Claims, and the General Unsecured Claims is denominated in U.S. dollars. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than as a Holder of a Claim, and the tax consequences for such Holders of Claims may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders of Claims (i) that hold 10% or more of the equity of the Debtors or will hold 10% or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan, (ii) whose Claims are Unimpaired Claims, (iii) that are deemed to reject the Plan, or (iv) that are otherwise not entitled to vote to accept or reject the Plan. This summary does not address the U.S. federal income tax consequences to Holders of Claims who also participate in the Equity Financing. The tax consequences to such Holders of Claims may differ materially from the consequences described herein, and any such Holders of Claims should consult with their tax advisors regarding the consequences to them in light of their individual circumstances.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Prepetition ABL Claim, Prepetition Term Loan Claim, or General Unsecured Claim that for U.S. federal income tax purposes is: (i) an individual citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Prepetition ABL Claim, Prepetition Term Loan Claim, or General Unsecured Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Prepetition ABL Claim, Prepetition Term Loan Claim, or General

Unsecured Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Prepetition ABL Claims, Prepetition Term Loan Claims, or General Unsecured Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE PLAN, AS WELL AS THE CONSEQUENCES TO THEM OF THE PLAN ARISING UNDER ANY OTHER U.S. FEDERAL TAX LAWS OR THE LAWS OF ANY STATE, LOCAL, OR NON-U.S. TAXING JURISDICTION OR UNDER ANY APPLICABLE TREATY.**

## B. Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors

### 1. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a taxpayer will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (i) the amount of any Cash, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange. Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if (a) the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception") or (b) the taxpayer is insolvent (but only to the extent of the taxpayer's insolvency) (the "Insolvency Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined. In general, tax attributes will be reduced in the following order: (i) net operating losses ("NOLs") and NOL carryforwards; (ii) general business credit carryovers; (iii) minimum tax credit carryovers; (iv) capital loss carryovers; (v) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (vi) passive activity loss and credit carryovers; and (vii) foreign tax credits carryovers. Deductions deferred under section 163(j) of the IRC ("163(j) Deductions") are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize a substantial amount of COD Income. The exact amount of any COD Income that will be realized by the Debtors will

not be determinable until the consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the New Common Equity and any other consideration, none of which can be determined until after the Plan is consummated. If the Debtors do not make an election under section 108(b)(5) of the IRC, their NOLs, if any, as well as a portion of their asset tax basis, will be reduced as a result of the COD attribute reduction arising in connection with the Plan.

### 2. Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

#### a. General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10 million or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Equity pursuant to the Restructuring Transaction will result in an "ownership change" of Leslie's, Inc. for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation.

#### b. General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 3.95 percent for changes that occur in October 2026). The 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. If a loss corporation has a net unrealized built-in loss (a "NUBIL") immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. The Reorganized Debtors are expected to have a NUBIL and therefore certain of the losses and deductions recognized by the Reorganized Debtors during the Recognition Period are expected to be subject to the 382 Limitation. Section 383 of the IRC applies a similar limitation to capital

loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

However, where the ownership change occurs pursuant to a confirmed chapter 11 plan, the annual limitation generally is calculated (with certain adjustments) by reference to the value of the debtor corporation's new stock immediately after the ownership change, but not in excess of the fair market value of the debtor corporation's pre-change gross assets. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

#### c. Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C. Certain U.S. Federal Income Tax Consequences to U.S. Holders

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. U.S. Holders of Prepetition ABL Claims, Prepetition Term Loan Claims, and General Unsecured Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

In certain cases discussed below, the U.S. federal income tax consequences to a U.S. Holder of Prepetition ABL Claims, Prepetition Term Loan Claims, and General Unsecured Claims will depend, in

part, on whether for U.S. federal income tax purposes (i) the ABL Claim, Term Loan Claim, and General Unsecured Claim surrendered by such U.S. Holder constitutes a "security" of a Debtor, and (ii) the New ABL Loans, New Term Loans and New Common Equity (or any other consideration) received by such U.S. Holder constitutes a stock or a "security" issued by the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity). Neither the IRC nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

Although the matter is not free from doubt, the Debtors expect that the Prepetition Term Loan Claims and the New Term Loans will be treated as "securities," and the Prepetition ABL Claims and the New ABL Facility will not be treated as "securities" for U.S. federal income tax purposes, and the remainder of this discussion assumes this to be the case.

***Due to the inherently factual nature of the determination of whether a debt instrument constitutes a "security", U.S. Holders of Prepetition ABL Claim and Prepetition Term Loan Claims are urged to consult their tax advisors regarding the status of such Claims as "securities" for U.S. federal income tax purposes.***

**1. Consequences of the Restructuring Transactions to U.S. Holders of Prepetition ABL Claims, Prepetition Term Loan Claims and General Unsecured Claims.**

Pursuant to the Plan, (i) a Holder of a Prepetition ABL Claim shall receive obligations under the New ABL Facility and (ii) a Holder of a Prepetition Term Loan Claim will receive its Pro Rata share of 10% of the New Common Equity.

A U.S. Holder of a Prepetition ABL Claim should realize gain or loss in an amount equal to the difference, if any, between (i) the issue price of the New ABL received, and (ii) such U.S. Holder's adjusted basis, if any, in such Prepetition ABL Claim exchanged therefor.

A U.S. Holder of a Term Loan Claim should realize gain or loss in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value of its Pro Rata share of the New Common Equity, and (y) the issue price of its Pro Rata share of the New Term Loans and (ii) such U.S. Holder's adjusted basis, if any, in such Term Loan Claim exchanged therefor.

Whether a U.S. Holder of a Prepetition ABL Claim or a Prepetition Term Loan Claim will recognize any such realized gain or loss will depend on whether such exchange constitutes a taxable exchange or a tax-deferred (or partially tax-deferred) exchange for such holder, which will in part depend on whether both the Claims surrendered and the loans or equity received in the exchange constitute "securities" for U.S. federal income tax purposes.

Based on the assumption that the Prepetition ABL Claims do not constitute securities for U.S. federal income tax purposes, other than with respect to any amounts received that are attributable to accrued but unpaid interest (which will be treated as described in "Accrued Interest" below), each U.S. Holder of Prepetition ABL Claims would be treated as engaging in a fully taxable exchange and should recognize all realized gain or loss. Such a holder should have a tax basis in the revolving loans received under the New ABL Facility equal to the issue price of such loans for U.S. federal income tax purposes, and the holding period in such revolving loans should commence on the day following the Effective Date.

Based on the assumption that the Prepetition Term Loan Claims and the New Term Loans constitute "securities" for U.S. federal income tax purposes, other than with respect to any amounts received that are attributable to accrued but unpaid interest (which will be treated as described in "Accrued Interest" below), each U.S. Holder of such Claims would be treated as engaging in a tax-deferred exchange with respect to their exchange of a Prepetition Term Loan Claim and generally would not recognize any gain or loss upon such exchange. Such a holder should have tax basis in the New Term Loans or the New Common Equity (as applicable) equal to such holder's adjusted tax basis in the Prepetition Term Loan Claims exchanged therefor (as applicable). Such a holder should have a holding period in the New Term Loans or the New Common Equity (as applicable) that includes such holder's holding period in the Prepetition Term Loan Claims exchanged therefor (as applicable).

Other than with respect to any amounts received that are attributable to accrued but unpaid interest (which will be treated as described in "Accrued Interest" below), each U.S. Holder of General Unsecured Claims would be treated as engaging in a fully taxable exchange and would recognize all realized gain or loss.

Where gain or loss is recognized by a U.S. Holder in an exchange of a Prepetition ABL Claim, a Prepetition Term Loan Claim, or a General Unsecured Claim pursuant to the Plan, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of such U.S. Holder, whether such Claim constitutes a capital asset in the hands of such U.S. Holder and how long it has been held, whether such Claim was acquired at a market discount, and whether and to what extent such U.S. Holder previously claimed a worthlessness deduction with respect to such Claim. In general, any gain or loss generally should be long-term capital gain or loss if the U.S. Holder held the Prepetition ABL Claim, the Prepetition Term Loan Claim, or the General Unsecured Claim as a capital asset and such U.S. Holder's holding period in such Claim is more than one year at the time of the relevant exchange. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital losses is subject to significant limitations.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### 2. Accrued Interest

To the extent that the fair market value of the consideration received by a U.S. Holder on an exchange of its Prepetition ABL Claim or Prepetition Term Loan Claim under the Plan is attributable to accrued but unpaid interest on such Prepetition ABL Claim or Prepetition Term Loan Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary interest income (to the extent such amount was not previously included in the gross income of such U.S. Holder). Conversely, a U.S. Holder of such a Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The fair market value of the consideration received by a U.S. Holder of a Prepetition ABL Claim or a Prepetition Term Loan Claim under the Plan will be allocated first to the principal amount of such Claims, with any excess allocated to accrued but unpaid interest on such Claims, if any.

U.S. Holders of Prepetition ABL Claims or Prepetition Term Loan Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 3. Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Prepetition ABL Claim or a Prepetition Term Loan Claim who exchanges such Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a *de minimis* amount (equal to 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain recognized by a U.S. Holder on the disposition of a Prepetition ABL Claim or a Prepetition Term Loan Claim (determined as described above) which was acquired with market discount should be treated as ordinary income to the extent of the amount of market discount that accrued thereon while such Claim was treated as held by such U.S. Holder (unless such U.S. Holder elected to include such amount of market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Prepetition ABL Claim or Prepetition Term Loan Claim that was acquired with market discount in a tax-deferred transaction for other property, any market discount that accrued on such Claim *(i.e.,* up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

***U.S. Holders of Prepetition ABL Claims and Prepetition Term Loan Claims are urged to consult their own tax advisors concerning the application of the market discount rules to their Prepetition ABL Claims and Prepetition Term Loan Claims.***

### 4. Consequences to U.S. Holders of the Ownership and Disposition of New Common Equity

#### a. Dividends on New Common Equity

Any distributions made on account of the New Common Equity (other than certain distributions of stock of Leslie's, Inc.) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Leslie's, Inc. as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in the New Common Equity. Any such distributions in excess of the U.S. Holder's basis in the New Common Equity (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction and distributions treated as

dividends paid to U.S. Holders that are taxed as individuals generally will be eligible for the preferential tax rates that apply to "qualified dividend income", in each case so long as Leslie's, Inc. has sufficient earnings and profits and certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

#### b. Sale, Redemption or Other Taxable Disposition of New Common Equity

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Equity. Such capital gain generally will be long-term capital gain if at the time of the sale, redemption, or other taxable disposition, the U.S. Holder has held the New Common Equity for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claims or recognized an ordinary loss on the exchange of its Claims for New Common Equity.

### 5. Consequences to U.S. Holders of the Ownership and Disposition of the New ABL or the New Term Loans

The following discussion applies only to the New ABL Facility and the New Term Loans that are treated as indebtedness for U.S. federal income tax purposes and assumes that the "contingent payment debt instrument" rules do not apply to such New ABL Facility or New Term Loans. U.S. Holders should consult their own tax advisors regarding the application of these rules.

#### a. Payments of Qualified Stated Interest.

Payments or accruals under the New ABL Facility or New Term Loans, to the extent constituting "qualified stated interest," will generally be includible in the U.S. Holder's gross income as ordinary interest income and taxable at the time that such payments are accrued or are received in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the applicable loan under the New ABL Facility or the New Term Loans at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices.

#### b. Issue Price, Original Issue Discount.

A debt instrument may be treated as issued with original issue discount for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by an amount equal to or greater than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." For purposes of determining whether there is original issue discount, the de minimis amount is generally equal to 1/4 of 1 percent of the stated redemption price at maturity of the applicable debt instrument multiplied by the number of complete years to maturity from the original issue date, or if the debt instrument provides for payments other than payments of qualified stated interest before maturity, multiplied by the weighted

average maturity of the debt instrument (as determined under applicable Treasury Regulations). If any loan under the New ABL Facility or the New Term Loans is treated as issued with original issue discount, a U.S. Holder of such instrument generally (i) will be required to include the original issue discount in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of such instrument in advance of the receipt of the cash attributable to such original issue discount and regardless of the U.S. Holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any cash payment on such instrument that is attributable to previously accrued original issue discount that has been included in its income. If the amount of original issue discount on any such loan is *de minimis*, rather than being characterized as interest, any payment attributable to the *de minimis* original issue discount generally will be treated as gain from the sale of such instrument and a *pro rata* amount of such *de minimis* original issue discount must be included in income as principal payments are received on such loan.

If a U.S. Holder's initial tax basis in a loan is greater than its adjusted issue price and less than or equal to its stated redemption price at maturity, the loan will be considered to have been purchased at an "acquisition premium." Under the acquisition premium rules, the amount of original issue discount that a U.S. Holder must include in gross income with respect to the loan for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year.

As a general matter, in determining the "issue price" of any loan under the New ABL Facility or the New Term Loans, (a) if such instrument is "publicly traded," then the trading value of such instrument determines its issue price; (b) if such instrument is not "publicly traded," but the Claim exchanged therefor is "publicly traded," the trading value of such Claim exchanged therefor determines its issue price (unless such trading values represent mere indicative quotes and a position is established that demonstrates that such indicative quote materially misrepresented the fair market value of such property, in which case a U.S. Holder can use any method that provides a reasonable basis of fair market value); and (c) if neither such instrument nor such Claim exchanged therefor is "publicly traded," the issue price of such instrument would be its stated redemption price at maturity. The Treasury Regulations provide, however, that a debt instrument is not publicly traded if the outstanding stated principal amount of such debt instrument does not exceed $100 million. In general, a U.S. Holder of Claims must follow the Debtors' determination of issue price with respect to each debt instrument issued under the Plan, unless such U.S. Holder specifically discloses its disagreement with such determination on the U.S. Holder's own tax return.

#### c. Sale, Exchange, or other Taxable Disposition

Upon the disposition of any loan under the New ABL Facility or the New Term Loans by sale, exchange, retirement, redemption, or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but unpaid qualified stated interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's initial tax basis in such instrument. The calculation of a U.S. Holder's adjusted tax basis in such instrument is discussed above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued original issue discount previously included in such U.S. Holder's gross income and reduced by any payments received on the instrument other than payments of qualified stated interest. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such instrument for longer than one year. Non-corporate U.S. taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders

The following discussion includes only certain U.S. federal income tax consequences of the transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holders and the ownership and disposition of the New Common Equity and New Term Loans.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of Claims pursuant to the Plan, or upon a subsequent disposition of the consideration received under the Plan, the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

#### 1. Gain Recognition in Connection with the Plan

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.

Any gain realized by a Non-U.S. Holder of a Prepetition ABL Claim and a Prepetition Term Loan Claim on the exchange of such Claim (other than any gain attributable to accrued but unpaid interest (or original issue discount, if any), which will be taxable in the same manner as described below in “Accrued Interest”) generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder’s capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to the gain realized on the exchange in the same manner as a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### 2. Accrued Interest

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but unpaid interest (or original issue discount, if any) with respect to Prepetition ABL Claims and Prepetition Term Loan Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the Non-U.S. Holder provides to the withholding agent, prior to receipt of such payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a). the Non-U.S. Holder actually or constructively owns ten percent or more of the total combined voting power of all classes of the Debtors’ stock entitled to vote;

(b). the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

(c). the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the IRC; or

(d). such interest (or original issue discount, if any) is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or suitable substitute or successor form or other such form as the IRS may prescribe) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax on a net basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest (or original issue discount, if any) at a rate of thirty percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but unpaid interest (or original issue discount, if any) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a thirty percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but unpaid interest (or original issue discount, if any). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. The aggregate consideration to be distributed to Holders of Prepetition ABL Claims and Prepetition Term Loan Claims will be allocated first to the principal amount of such Claims, with any excess allocated to accrued but unpaid interest on such Claims, if any.

### 3. Consequences to the Non-U.S. Holders of the Ownership and Disposition of New Common Equity

#### a. Dividends.

Any distributions made with respect to New Common Equity (other than certain distributions of stock of Leslie's, Inc.) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Leslie's, Inc., as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non-U.S. Holder's basis in such New Common Equity and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are not effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business ("ECI") (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or

exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS may prescribe), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Equity held by a Non-U.S. Holder that are ECI (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). Distributions to a Non-U.S. Holder treated as capital gain from a sale or exchange may also be subject to taxation under FIRPTA (as discussed below).

**b. Sale, Redemption, or Other Taxable Disposition of New Common Equity.**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale, redemption, or repurchase of New Common Equity of Leslie's, Inc. unless:

(a) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition;

(b) such gain is ECI (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(c) the issuer of such New Common Equity is or has been during a specified testing period a "United States real property holding corporation" (a "USRPHC") and certain other conditions are met.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Common Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gain at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Common Equity generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of its New Common Equity under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder ("FIRPTA"). Taxable gain from a Non-U.S. Holder's disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would constitute ECI. A Non-U.S. Holder would also generally be subject to withholding tax equal to fifteen percent of the amount realized on the disposition and generally required to file a U.S. federal

income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS.

In general, a corporation would be a USRPHC with respect to a Non-U.S. Holder if the fair market value of the corporation's U.S. real property interests (as defined in the IRC and applicable Treasury Regulations) equals or exceeds fifty percent of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) on any testing date within the shorter of (a) the five-year period ending on the effective time of the applicable disposition or (b) the Non-U.S. Holder's holding period for its interests in the corporation. The Debtors have not determined if they are, or whether the Reorganized Debtors will be, USRPHCs.

In general, FIRPTA will not apply upon a Non-U.S. Holder's disposition of its New Common Equity if (x) the New Common Equity are treated as "regularly traded" on an established market and (y) the Non-U.S. Holder did not directly or indirectly own more than five percent of the value of the outstanding New Common Equity during a specified testing period.

### 4. Consequences to Non-U.S. Holders of the Ownership and Disposition of the New ABL Facility or the New Term Loans.

#### a. Payments of Interest.

Subject to the discussion of backup withholding and FATCA below, interest income (which, for purposes of this discussion of Non-U.S. Holders, includes original issue discount, if any) of a Non-U.S. Holder that is not ECI will qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, provided that:

(a). the Non-U.S. Holder does not own, actually or constructively, ten percent or more of total combined voting power of all classes of the Debtors' stock entitled to vote;

(b). the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the IRC);

(c). the Non-U.S. Holder is not a bank receiving interest described in section 881(c)(3)(A) of the IRC; and

(d). the beneficial owner gives the applicable withholding agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a non-U.S. person.

If not all of these conditions are met, interest on the New ABL Facility or the New Term Loans paid to a Non-U.S. Holder that is not ECI will generally be subject to U.S. federal withholding tax at a 30 percent rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an IRS Form W-8BEN or W-8BEN-E, as applicable (or a suitable substitute or successor form or such other form as the IRS may prescribe), that has been properly completed and duly executed. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If interest on the New ABL Facility or the New Term Loans paid to a Non-U.S. Holder is ECI, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and the 30 percent withholding tax described above will not apply. To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or a suitable substitute or successor form or such other form as the IRS may prescribe). If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**b. Sale, Exchange, or Other Taxable Disposition of the New ABL Facility or the New Term Loans.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption, or other taxable disposition of any loan under the New ABL Facility or the New Term Loans (other than any amount representing accrued but unpaid interest thereon) unless:

(a). the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

(b). in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of such loan under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the disposition.

**5. FATCA**

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect

to their U.S. account holders and investors and comply with certain other requirements or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including interest, original issue discount, and dividends), and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder is urged to consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### E. Information Reporting and Back-up Withholding

The Debtors, Reorganized Debtors, and any other applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder). A Non-U.S. Holder can generally establish an exemption from backup withholding by providing a properly executed applicable IRS Form W-8. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN.**

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT**

**OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., OR NON-INCOME TAX LAW, AND OF ANY CHANGE IN APPLICABLE TAX LAW**.

[*Remainder of page intentionally left blank.*]

## XV. RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 20, 2026

**LESLIE'S, INC.**, .
on behalf of itself and all other Debtors

*/s/ Jeffrey White*

Jeffrey White
Chief Financial Officer

**Exhibit A**

**Plan of Reorganization**

**[***Filed at Docket No. 166]*

**Exhibit B**

**Restructuring Support Agreement**

[*Filed at Docket No. 5, Exhibit A*]

**Exhibit C**

**Liquidation Analysis**

[*To be filed at a later date.*]

# **<u>Exhibit D</u>**

## **Financial Projections**

[*To be filed at a later date.*]

# Exhibit E

## Valuation Analysis

[*To be filed at a later date.*]